# FILE

**IN CLERKS OFFICE**
**SUPREME COURT, STATE OF WASHINGTON**

DATE **JAN 2 2 2015**

*Madsen, C.J.*

**CHIEF JUSTICE**

This opinion was filed for record
at 8:00 AM on Jan 22, 2015

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 89830-8 |
| Respondent, | ) | |
| v. | ) | EN BANC |
| ODIES DELANDUS WALKER, | ) | |
| Petitioner. | ) | Filed: **JAN 2 2 2015** |

YU, J.— Odies Delandus Walker was convicted as an accomplice to first degree murder, first degree assault, first degree robbery, solicitation, and conspiracy. The primary question in this case is whether those convictions must be reversed in light of the PowerPoint presentation the prosecuting attorney used during closing argument. That presentation repeatedly expressed the prosecutor's personal opinion on guilt—over 100 of its approximately 250 slides were headed with the words "**DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER**," and one slide showed Walker's booking photograph altered with the words "**GUILTY BEYOND A REASONABLE DOUBT**," which were superimposed over his face in bold red letters. The prosecutor also appealed to

passion and prejudice by juxtaposing photographs of the victim with photographs of Walker and his family, some altered with the addition of inflammatory captions and superimposed text. While the prosecutor is entitled to draw the jury's attention to admitted evidence, those slides, as presented, served no legitimate purpose. Their prejudicial effect could not have been cured by a timely objection, and we cannot conclude with any confidence that Walker's convictions were the result of a fair trial. Consistent with both long-standing precedent and our recent holding in *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 286 P.3d 673 (2012), we must reverse Walker's convictions and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

We summarize the underlying facts to provide a context for our decision in this case. The State's evidence supports the following version of the events.

During the relevant time period, Walker lived with his girlfriend, Tonie Marie Williams-Irby; several of their children; and Walker's cousin, Calvin Finley. Williams-Irby worked at a Walmart in Lakewood as a department manager. Williams-Irby told Walker, Finley, and another friend (Jonathan) that she knew what time an armored truck arrived each day to pick up the store's daily receipts and knew the average daily amount of those receipts from staff meetings. Several weeks later, Walker discussed the armored truck with Finley and Jonathan, saying it would be "easy money." 7 Verbatim Report of Proceedings (VRP) at 656.

Jonathan was later excluded from the robbery discussions. Other potential participants were considered, and ultimately Walker, Finley, and their friend Marshawn Turpin made a plan to rob the armored truck "custodian." 4 VRP at 170. During this preliminary planning stage, Walker and Finley discussed the possibility that Finley might need to shoot the armored truck custodian. Walker told Finley to "do what you got to do," 7 VRP at 665, and that Walker would provide a gun. Williams-Irby was aware of these plans and would regularly answer Walker's questions about the amount of the store's daily receipts.

On the day of the crime, Walker drove Williams-Irby to work and asked her to find out what the day's receipts would be. Williams-Irby went to the daily staff meeting and reported to Walker that the day's receipts totaled $207,000. Walker and Finley then drove to the Walmart in a white Buick Oldsmobile. Turpin arrived in a gold Nissan Maxima, then entered the parked Buick. When the armored truck arrived to pick up the money, Finley and Turpin entered the store while Walker remained in the Buick. Finley was armed with a handgun. As the armored truck custodian reached the store entrance to leave, Finley and Turpin approached him and Finley shot him in the head, killing him. Finley and Turpin grabbed the money bag and fled in the Buick. Walker drove them to an alley behind a friend's house to ditch the car. Walker later returned to the Walmart to pick up the gold Nissan.

When Williams-Irby returned home from work, Walker told her that they needed to go to where he had left the Buick so he could wipe away his fingerprints. When they got there, police officers were milling around the car, so they left and drove to another friend's house (Al Trevino). Williams-Irby testified that on the way to Trevino's house, Walker told her that he was in the white Buick in the Walmart parking lot and was on the phone with Finley during the robbery. When Finley asked for the money, the armored truck driver laughed, so Walker told Finley to "kill the mother fucker." 8 VRP at 729.

Finley and Turpin were already at Trevino's house when Walker and Williams-Irby arrived. After distributing some of the cash, Walker, Finley, and Turpin placed the clothes they were wearing during the robbery and the now-empty money bag into a plastic bag, which Finley discarded in a nearby river.

Walker and Williams-Irby left Trevino's house after about 30 minutes and drove to a motel in Fife where Walker met up with Finley and Trevino. Walker and Williams-Irby then drove to a Walmart in Federal Way, and Walker bought two safes and a video game system. Walker kept one safe for himself and drove back to Fife to give the other safe to Finley. Walker and Williams-Irby then returned home, where Walker put a gun and his share of the robbery proceeds in his safe and put the safe and the video game system in his bedroom closet.

Walker then took Williams-Irby and their children out for dinner at Red Lobster. At dinner, Walker told Williams-Irby's son, "This is how you murder these niggers and get this money." *Id.* at 773. Walker paid the bill for the meal, nearly $200, in cash. Police pulled over and arrested Walker and Williams-Irby as they drove home from the restaurant. Williams-Irby told police she didn't know anything. When interviewed by police, Walker denied having any involvement with the robbery.

Williams-Irby was charged and, after entering into a plea agreement with the State, testified against Walker consistent with the above factual summary. The State charged Walker as an accomplice to aggravated first degree premeditated murder, first degree felony murder, first degree assault, first degree robbery, first degree solicitation to commit robbery, and first degree conspiracy to commit robbery. The State also sought deadly weapon enhancements for the murder, assault, and robbery charges.

In opening statements, the prosecutor said:

> When the police question the defendant, he is being—he is adamant. He is cursing. He is yelling. He is swearing. He is saying he didn't have any idea why the police stopped him. Why did you arrest me? I didn't do anything. I had nothing to do with it. My wife, Williams-Irby, she didn't have anything to do with this. He is lying like crazy to the police. Williams-Irby pled guilty to second-degree murder, and she will tell you what she had to do with it. He told the cops he didn't have anything to do with it.
> . . . At the close of this case, we are going to ask you to convict the defendant of each one, every one of these righteous charges that

have been filed against him.

Suppl. VRP (Mar. 7, 2011) at 48, 52. Walker's counsel did not object to these statements.

During closing remarks, the prosecutor utilized a PowerPoint presentation made up of approximately 250 slides. Over 100 of those slides have the heading **"DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER."** Pl.'s Ex. 243, at 6-7, 9-49, 54, 56-59, 61-66, 68-77. Two slides have the heading **"DEFENDANT WALKER GUILTY OF ASSAULT IN THE FIRST DEGREE,"** *id.* at 83, and three have the heading **"DEFENDANT WALKER GUILTY OF SOLICITATION TO COMMIT ROBBERY,"** *id.* at 85-86. The PowerPoint also includes a slide superimposing the words **"GUILTY BEYOND A REASONABLE DOUBT"** over Walker's booking photo. *Id.* at 87. The record contains only grayscale copies of the slides, but the briefing indicates that the lettering was in bright red. *See* Pet'r's Suppl. Br. at 2.



Pl.'s Ex. 243, at 87.

There is a series of slides suggesting Walker is guilty because he used the stolen money for video games and lobster. The first asserts, "Defendant Walker is **GUILTY** as an **ACCOMPLICE** to the murder because he **SPLURGED ON FRIVOLOUS THINGS**." *Id.* at 63. The next slides explain that those splurges included "[two] safes, a WII [sic] and several games at the Federal Way Walmart," as well as "$200.00 for dinner at the Red Lobster." *Id.* at 63-64. The next slide is a photo of Walker and his family happily eating that dinner. *Id.* at 64.

| DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER<br><br>(28) Defendant Walker is GUILTY as an ACCOMPLICE to the murder because he SPLURGED ON FRIVOLOUS THINGS | DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER<br><br>DEFENDANT SPLURGED<br><br>• Defendant Walker purchased 2 safes, a WII and several games at the Federal Way Walmart |
| --- | --- |
| DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER<br><br>DEFENDANT SPLURGED<br><br>• Defendant spent $200.00 for dinner at the Red Lobster |  |

*Id.* at 63-64.

Several other slides include photographs that were admitted exhibits, but altered with captions, headings, and superimposed text. For example, one slide is a photograph of money seized by police with the heading "**MONEY IS MORE IMPORTANT THAN HUMAN LIFE**":



*Id.* at 5. It was not alleged that Walker, or anyone else, actually said those words.

Another particularly problematic example of admitted exhibits altered with inflammatory text comes near the end of the presentation. First, a slide depicts an in-life photograph of the victim with a superimposed heading reading "**DEFENDANT'S GREED AND CALLOUS DISREGARD FOR HUMAN LIFE**" and text detailing the money stolen and its distribution amongst the participants. *Id.* at 88. That slide is juxtaposed with the one immediately following it, the same photograph of Walker and his family eating dinner at the Red Lobster used earlier, but this time with a caption "**"THIS IS HOW YOU MURDER AND**

**ROB NIGGERS NEXT TIME IT WILL BE MORE MONEY.'"** *Id.* at 89. Next

comes Walker's booking photograph, altered with the caption, "'**WE ARE**

**GOING TO BEAT THIS,**'" contrasted with the final image, an in-life photograph

of the victim. *Id.*






*Id.* at 88-89.

During the State's closing, Walker's attorney unsuccessfully objected to the

State's discussion of premeditation and a slide analogizing premeditation to

stopping at a railroad crossing. 12 VRP at 1376-80. However, Walker's counsel never objected to the PowerPoint slides referenced here.

Walker did not testify, and he was subsequently convicted of all charges. He appealed his convictions, claiming prosecutorial misconduct, improper jury instructions, and ineffective assistance of counsel. In a partially published opinion, the Court of Appeals affirmed the convictions. *State v. Walker*, 178 Wn. App. 478, 315 P.3d 562 (2013) (published in part). Walker petitioned for review.[1] The State did not file an answer to Walker's petition,[2] and we granted review. *State v. Walker*, 180 Wn.2d 1002, 321 P.3d 1206 (2014).

## ANALYSIS

I.     Prosecutorial misconduct violated Walker's right to a fair trial

Walker argues that the prosecutor committed reversible misconduct primarily in the PowerPoint presentation used during closing argument.[3] We recently addressed this very same issue in *Glasmann*, 175 Wn.2d 696, and it is regrettable that some prosecutors continue to defend these practices and the

---

[1]Because we reverse Walker's convictions due to prosecutorial misconduct, we do not reach Walker's claim that he received ineffective assistance of counsel.

[2]In its supplemental brief, the State reasserts the cross assignment of error it raised on direct appeal. That issue is not properly before us, and we will not consider it. RAP 13.4(d).

[3]Walker also contends the prosecutor committed misconduct during opening statements. The prosecutor's assertion that Walker was "lying like crazy" because his statements to the police conflicted with Williams-Irby's testimony, Suppl. VRP (Mar. 7, 2011) at 48, improperly vouched for Williams-Irby's credibility. *State v. Allen*, 176 Wn.2d 611, 631, 294 P.3d 679 (2013). We need not determine whether it was reversible error because the impropriety of the prosecutor's closing was so egregious.

validity of convictions obtained by using them. We reject the State's arguments

that *Glasmann* is materially distinguishable and should be disavowed in part and

hold that, as in *Glasmann*, the State's PowerPoint presentation requires reversal of

Walker's convictions.

A.      The prosecutor's duty is to seek justice, not merely convictions

We have had numerous occasions to point out the dual roles of a prosecutor.

"A prosecutor must enforce the law by prosecuting those who have violated the

peace and dignity of the state by breaking the law." *State v. Monday*, 171 Wn.2d

667, 676, 257 P.3d 551 (2011) (citing *State v. Case*, 49 Wn.2d 66, 70-71, 298 P.2d

500 (1956) (quoting *People v. Fielding*, 158 N.Y. 542, 547, 53 N.E. 497 (1899))).

At the same time, a prosecutor "functions as the representative of the people in a

quasijudicial capacity in a search for justice." *Id.* A prosecutor does not fulfill

either role by securing a conviction based on proceedings that violate a defendant's

right to a fair trial—such convictions in fact undermine the integrity of our entire

criminal justice system. We fail to appreciate why the prosecutor felt these slides

were necessary to secure a conviction, and remain committed to the words of

*Fielding*, which resonate as strongly today as when they were first made over 100

years ago:

> "[A] public prosecutor . . . is a *quasi*-judicial officer, representing the
> People of the state, and presumed to act impartially in the interest only
> of justice. If he lays aside the impartiality that should characterize his
> official action to become a heated partisan, and by vituperation of the

prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment."

*Id.* at 676 n.2 (alterations in original) (quoting *Fielding*, 158 N.Y. at 547, *quoted with approval in Case*, 49 Wn.2d at 70-71).

Attorneys may use multimedia resources in closing arguments to summarize and highlight relevant evidence, and good trial advocacy encourages creative use of such tools. Moreover, closing arguments are an opportunity for counsel to argue reasonable inferences from the evidence. However, advocacy has its limits, and a prosecutor has the duty to "subdue courtroom zeal," not to add to it, in order to ensure the defendant receives a fair trial. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011); *see State v. Reed*, 102 Wn.2d 140, 147, 684 P.2d 699 (1984) (Prosecutors are "public officers whose 'devotion to duty is not measured, like the prowess of the savage, by the number of their victims.'" (quoting *State v. Montgomery*, 56 Wash. 443, 447-48, 105 P. 1035 (1909))).

In reversing Walker's convictions, we do not retreat from the general rule that a defendant should contemporaneously object to improper comments. Proper and timely objections provide the trial court an opportunity to correct the misconduct and caution jurors to disregard it. It prevents abuse of the appellate process and saves the substantial time and expense of a new trial. *State v. Emery*, 174 Wn.2d 741, 761-62, 278 P.3d 653 (2012). However, the failure to object will

not prevent a reviewing court from protecting a defendant's constitutional right to a fair trial. "An objection is unnecessary in cases of incurable prejudice only because 'there is, in effect, a mistrial and a new trial is the only and the mandatory remedy.'" *Id.* at 762 (quoting *Case*, 49 Wn.2d at 74). Reversing a defendant's convictions for prosecutorial misconduct is a serious remedy that we do not lightly impose given the consequential impact on the victim or his or her family and the expense of a new trial.

B.     The prosecutor committed egregious misconduct in its closing PowerPoint presentation

A defendant arguing that prosecutorial misconduct violated his or her right to a fair trial has the burden of showing the prosecutor's conduct was both improper and prejudicial in the context of the entire trial. *Glasmann*, 175 Wn.2d at 704. And where a defendant raises the issue for the first time on appeal, the defendant must also show "that the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Id.* We do not focus on the prosecutor's subjective intent in committing misconduct, but instead on whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards and whether that prejudice could have been cured with a timely objection. *Emery*, 174 Wn.2d at 762.

We have no difficulty holding the prosecutor's conduct in this case was improper. Closing argument provides an opportunity to draw the jury's attention to

the evidence presented, but it does not give a prosecutor the right to present altered versions of admitted evidence to support the State's theory of the case, to present derogatory depictions of the defendant, [4] or to express personal opinions on the defendant's guilt. *Glasmann*, 176 Wn.2d at 706-07, 712. Furthermore, RPC 3.4(e) expressly prohibits a lawyer from vouching for any witness's credibility or stating a personal opinion "on the guilt or innocence of an accused." The prosecution committed serious misconduct here in the portions of its PowerPoint presentation discussed above—it included multiple exhibits that were altered with inflammatory captions and superimposed text; it suggested to the jury that Walker should be convicted *because* he is a callous and greedy person who spent the robbery proceeds on video games and lobster; it plainly juxtaposed photographs of the victim with photographs of Walker and his family, some altered with racially inflammatory text; and it repeatedly and emphatically expressed a personal opinion on Walker's guilt.

> C.    The misconduct was prejudicial to Walker's case and could not have been cured with a timely objection

Both this case and *Glasmann* deal with PowerPoint presentations during closing argument that included altered exhibits, expressions of the prosecutor's

---

[4]We agree with that portion of Justice Gordon McCloud's concurrence noting that some of the State's PowerPoint slides implicitly encouraged a verdict specifically based on racial prejudice.

opinion on the defendant's guilt, and clear efforts to distract the jury from its proper function as a rational decision-maker. *Glasmann* required the jury to analyze the "nuanced distinctions" between different degrees of offenses. *Id.* at 710. The issue at trial here was the extent, if any, of Walker's involvement in the crimes, requiring the jury to make sense of a multistage criminal scheme with several participants playing separate roles. The State's PowerPoint presentation obfuscated the complicated facts presented to the jury here at least as much as the presentation in *Glasmann* did. The State's misconduct here was so flagrant, pervasive, and prejudicial that it could not have been overcome with a timely objection and an instruction to the jury to disregard the improper slides.[5]

Our analysis of "prejudicial impact" does not rely on a review of sufficiency of the evidence. The Court of Appeals minimized the prejudicial impact because "the State's case was strong and Walker's theory was not nearly as plausible as the defendants' theories in *Reed* and *Glasmann*." *State v. Walker*, No. 41970-0-II, slip op. (unpublished portion) at 17 (Wash. Ct. App. Dec. 20, 2013). While the State had strong evidence in those cases—enough to affirm the convictions had the defendant challenged the sufficiency of the evidence—"[t]he focus must be on the misconduct and its impact, not on the evidence that was properly admitted."

---

[5]We decline the State's invitation to adopt the plain error standard contemplated by Fed. R. Crim. P. 52(b).

*Glasmann*, 175 Wn.2d at 711. The voluminous number of slides depicting statements of the prosecutor's belief as to defendant's guilt, shown to the jury just before it was excused for deliberations, is presumptively prejudicial and may in fact be difficult to overcome, even with an instruction.

Equally troubling is the Court of Appeals' suggestion that to be entitled to a fair trial, Walker had the duty to come up with some plausible defense theory beyond the State's failure to meet its burden of proof and to produce evidence in support. *Walker*, slip op. at 16-17 (unpublished portion). This suggestion disregards "the bedrock upon which the criminal justice system stands"—every defendant is entitled to a presumption of innocence, which is overcome only when the State proves guilt beyond a reasonable doubt as determined by an impartial jury based on evidence presented at a fair trial. *State v. Bennett*, 161 Wn.2d 303, 315, 165 P.3d 1241 (2007).

We decline the State's invitation to disavow *Glasmann* to the extent it holds the prosecution should have known it was committing misconduct.[6] *Glasmann* is certainly not the first case to hold that visual aids must be used only for their proper purpose. Nearly 30 years ago, the Court of Appeals observed that "in order

---

[6]*Glasmann* does not hold that the color red is inherently prejudicial, that the use of all capital letters always constitutes shouting, or that the word "guilty," when presented as a written word in a visual aid, always constitutes an improper expression of the prosecutor's opinion on guilt. Because it misconstrues our holdings, we need not consider the State's argument that we should disavow them.

to help the jury more easily understand other evidence, modern visual aids can and should be utilized. A trial judge must, however, be careful to avoid letting the visual aids be used more for their shock value than to educate." *State v. Strandy*, 49 Wn. App. 537, 541-42, 745 P.2d 43 (1987). There is also nothing new about the idea that purported visual aids can cross the line into unadmitted evidence. *E.g.*, *Holland v. United States*, 348 U.S. 121, 127-28, 75 S. Ct. 127, 99 L. Ed. 150 (1954); *Gustin v. Jose*, 11 Wash. 348, 350, 39 P. 687 (1895). Given the serious need to curb abuses of such visual presentations, we encourage trial court judges to intervene and to preview such slides before they are shown to a jury. Providing the presiding judicial officer with a printed copy of the PowerPoint slides in advance is not burdensome and could curtail the necessity of a retrial due to misconduct.

Walker has met his burden of showing that the State committed prosecutorial misconduct that was so prejudicial and flagrant that it denied Walker his constitutional right to a fair trial.

II.     The jury was properly instructed on the law of accomplice liability

While prosecutorial misconduct committed at trial is dispositive, we address Walker's challenge to the jury instructions in case the issue is raised on remand. Our review of the legal sufficiency of jury instructions is de novo. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). Jury instructions are not legally

sufficient if they relieve the State of its burden to prove every essential element of the charged crime. *State v. Byrd*, 125 Wn.2d 707, 713-14, 887 P.2d 396 (1995).

Walker specifically challenges the definitional and to-convict instructions on premeditated murder.[7] The definitional instruction reads, "A person commits the crime of premeditated murder in the first degree, as charged in Count I, when, with a premeditated intent to cause the death of another person, he or an accomplice causes the death of another person." Clerk's Papers at 213. The to-convict instruction reads:

> To convict the defendant of the crime of premeditated murder in the first degree, [C]ount I, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about [the] 2nd day of June, 2009, the defendant or an accomplice acted with intent to cause the death of Kurt Husted;
>
> (2) That the intent to cause the death was premeditated;
>
> (3) That Kurt Husted died as a result of the defendant's or an accomplice's acts; and
>
> (4) That any of these acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

---

[7]Walker objected to the to-convict instruction at trial, 12 VRP at 1331, but did not object to the definitional instruction. Jury instructions that relieve the State of its burden to prove every element of the crime charged may be considered for the first time on review. *State v. O'Hara*, 167 Wn.2d 91, 100-01, 217 P.3d 756 (2009).

*Id.* at 216. Walker argues these instructions allowed the jury to convict him as an accomplice to premeditated murder even if the jury may have believed that the principal (Finley, the shooter) had committed only intentional murder without premeditation. This, Walker argues, relieved the State of its burden of proving the essential element that the principal in fact committed the crime that Walker was charged with as an accomplice—intentional murder with premeditation.

In the premeditated murder context, the level of knowledge or intent shared between an accomplice and principal may be a highly relevant issue. *See, e.g.,* *State v. Roberts*, 142 Wn.2d 471, 505, 14 P.3d 713 (2000). We do not foreclose the possibility that the level of shared intent may be important in other cases and circumstances, including some we have not yet considered, but it is not a relevant consideration here.[8]

The complicity statute makes an accomplice legally accountable for a crime "if it is committed by the *conduct* of another person." RCW 9A.08.020(1) (emphasis added). The statute provides that one can be liable as an accomplice for another's conduct even where the accomplice is "legally incapable" of committing

---

[8] The concurrence ignores the evidence presented in this case and instead attempts to gradually erode accomplice liability under a hypothetical case. *See* concurrence (Gordon McCloud, J.) at 9, 13. Contrary to the suggestion that the jurors might have convicted Walker even if he may have done nothing since he was not the shooter, the evidence presented showed that Walker planned the robbery with Finley, provided the gun, and ordered Finley to shoot. Jurors are not so easily confused by multiple instructions and are capable of understanding the difference between guilt by association and guilt because a person helped plan and carry out a murder.

the crime, RCW 9A.08.020(4), and that one can be convicted as an accomplice even if the principal is not prosecuted for or convicted of the same (or any) crime, RCW 9A.08.020(6).

Walker concedes that this court and the Court of Appeals have affirmed other convictions where a jury may have split the elements between two participants. Pet'r's Suppl. Br. at 29 (citing *State v. McDonald*, 138 Wn.2d 680, 981 P.2d 443 (1999); *State v. Hoffman*, 116 Wn.2d 51, 804 P.2d 577 (1991); *State v. Haack*, 88 Wn. App. 423, 958 P.2d 1001 (1997)); *see State v. Kwan Fai Mak*, 105 Wn.2d 692, 743-45, 718 P.2d 407 (1986), *rejected in part on other grounds by State v. Hill*, 123 Wn.2d 641, 645, 870 P.2d 313 (1994). As held by the Court of Appeals below, the law of accomplice liability allows the jury to reach a conviction by splitting the elements of premeditated first degree murder between accomplices. *Walker*, 178 Wn. App. at 486 (citing *Haack*, 88 Wn. App. at 427-28). A conviction based on split elements may be affirmed "[s]o long as the State proved beyond a reasonable doubt to the satisfaction of all of the jurors that at least one of the participants [had the requisite intent] and at least one but not necessarily that same participant [committed the criminal act]." *Haack*, 88 Wn. App. at 429.

Walker argues that he was not physically present at the shooting, while in *Haack*, *Hoffman*, and *McDonald* there was evidence that the defendant was physically present. In some cases this might be an important factual distinction, but

here it is not. A trial court's jury instructions must be considered in the context of the case actually presented. In this case the State introduced evidence that Walker and Finley planned the crime ahead of time, such that Finley could have premeditated intent *and* caused the death. It also introduced evidence that Walker contemporaneously participated in the crime via cellular phone, and in fact ordered the shooting, such that Walker could also have both premeditated and partially caused the death.[9] Walker concedes that splitting the elements makes sense when there is evidence that both participants acted as principals. Such evidence was presented here, and the instructions were proper.

III.    The lack of a unanimity instruction on accomplice liability did not violate Walker's right to a unanimous jury verdict

Walker also argues that the jury instructions discussed above, when given without a unanimity instruction, violated his right to a unanimous jury verdict. We have already rejected this argument because principal and accomplice liability are not alternative means. *Hoffman*, 116 Wn.2d at 104-05. The Court of Appeals correctly concluded that the jury needs to unanimously find only that both the principal and accomplice participated in the crime; it need not unanimously conclude as to the manner of participation. It does not matter in this case that

---

[9]It is not a defense that another person also partially caused the death. *State v. McDonald*, 138 Wn.2d 680, 690-91, 981 P.2d 443 (1999).

Finley, not Walker, performed the actual shooting given Walker's level of involvement and participation.

Walker urges us to disavow this precedent, arguing that the right to a unanimous verdict under article I, section 21 of the Washington Constitution is greater than that provided in the United States Constitution under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). A *Gunwall* analysis is appropriate where the contours of the Washington Constitution are not fully developed, but on this issue our precedent is clear, and Walker's cursory *Gunwall* analysis is insufficient to show it should be disavowed. No Washington court has examined article I, section 21 under *Gunwall* to determine whether or not an accused person has a constitutional right to jury unanimity as to the mode of participation in a felony accomplice case, and we decline to do so without sufficient analysis.

## CONCLUSIONS

We affirm the Court of Appeals' holding that the jury instructions properly stated the law on accomplice liability and did not violate Walker's right to a unanimous jury verdict. However, we reverse its conclusion that Walker received a fair trial in light of the prosecutorial misconduct the State committed in its closing argument and we reverse Walker's convictions and remand for a new trial.

WE CONCUR:

Madsen, C.J.

González, J.

Fairhurst, J.

No. 89830-8

STEPHENS, J. (concurring)—I agree with the majority that the State's misconduct during closing argument requires reversal of Odies Delandus Walker's conviction, consistent with our decision in *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 286 P.3d 673 (2012). However, I share Justice Gordon McCloud's view that the State was entitled to call out admitted evidence during closing argument and that the misconduct was not as far reaching as the majority suggests. Therefore, I join Justice Gordon McCloud's concurrence on this issue.

In light of the court's holding on prosecutorial misconduct during closing argument, it is unnecessary to opine on any other issues. Nonetheless, the majority and concurrence correctly recognize that the trial court on remand may benefit from guidance with respect to the jury instructions addressing accomplice liability. I concur in the majority's resolution of this issue.

Stephens, J.

Wiggins, J.

No. 89830-8

GORDON McCLOUD, J. (concurring)—I agree with the majority that the prosecutor's closing argument in this case contained so much personal opinion, vouching, and inflammatory imagery that we must reverse. But it is the vouching, prejudice, and the inflammatory imagery that necessitate reversal, not the prosecutor's use of actual admitted evidence. And some of the material on the PowerPoint slides that the majority quotes and reproduces fall into the latter, permissible category—evidence—rather than the former, impermissible category. I write separately to try to clarify the difference between the two categories: the permissible use of unaltered, admitted, but very damaging evidence on the one hand and the impermissible use of inflammatory images that were not admitted, on the other. I conclude that the many slides carrying the prosecutor's opinion of "guilty" are not just impermissible but also inflammatory and prejudicial. The majority, however, also criticizes several slides that do not contain the prosecutor's opinion. I write separately to explain the majority's perhaps unstated assumption: those slides are inflammatory and prejudicial because they highlight the defendant's race.

1

I also write to disagree with the majority's endorsement of the wording of the elements, or "to convict," instruction. That instruction allowed the jury to convict if either the accomplice "or" the defendant held a specific mens rea and either the accomplice "or" the defendant committed specific acts. It is confusing. The problem is not just the one the majority addresses, i.e., that the instruction allows a conviction even if the jury concludes that the prohibited act and the prohibited mens rea are "split" between the defendant and some other participant. The problem is that such an instruction could be read to allow the jury to convict even if it concludes that *both* the prohibited act *and* the prohibited mens rea are attributable to another participant, and not to the defendant. I would not endorse that language but would advise trial courts to go back to using an accomplice liability instruction along with a simple "to convict" instruction referring solely to the defendant. The combination of the two allows the jury to convict the defendant as either principal or accomplice without all the confusion.

For these reasons, I respectfully concur.

I.     The Prosecutor Committed Misconduct by Vouching and by Making Inflammatory Arguments, but Not by Using Admitted Evidence

The majority correctly explains that it is impermissible for the prosecutor to vouch for the credibility of witnesses, to appeal to jury prejudices, or to convey a personal opinion about the defendant's guilt. *In re Pers. Restraint of Glasmann*, 175

2

Wn.2d 696, 286 P.3d 673 (2012); *State v. Lindsay*, 180 Wn.2d 423, 432, 437, 326 P.3d 125 (2014). The majority tracks the closing argument in this case and explains how the deputy prosecutor committed each of those errors, again and again, during closing.

But not all of the images pictured on the PowerPoint slides that the majority criticizes contain personal opinions about guilt. Some of them contained actual quotations from or portions of photos from properly admitted evidence, or both. For example, the majority criticizes the PowerPoint slide containing a photo of the defendant's family at dinner after the murder with an inculpatory caption. But the photo of the family at dinner was admitted (over what sounds like a relevance objection). Ex. 210; 8 Verbatim Report of Proceedings (VRP) at 775. It was certainly relevant: whether Walker had extra money burning a hole in his pocket immediately after a $200,000 robbery is certainly probative of whether he is the one who committed and benefitted from that robbery.[1] And the record further shows that witness Williams-Irby testified, when referring to both the murder and the robbery, that it was Walker himself who stated, after the robbery-murder, "This is how you

---

[1] *State v. Luvene*, 127 Wn.2d 690, 709, 903 P.2d 960 (1885) (defendant's "possession of unusual amounts of money around the time of the robbery . . . is relevant in that it has some tendency to make it more probable that [the defendant] committed the robbery").

murder these n[_____] and get this money. The next time, it will be more money."
8 VRP at 773. I agree that this testimony is highly damaging to Walker. But it was a statement that witness Williams-Irby attributed to Walker. *Id.* It is thus both admissible, Evidence Rule (ER) 801(d)(2), 804(b)(3), and relevant to whether Walker committed murder and robbery. ER 401. In fact, it's a confession. I think we should make clear that extremely damaging evidence and confessions, which constitute actual evidence, are fair game during closing.

Nevertheless, I agree with the majority that the slide containing the "n_____" quote was improper. I write separately to explain why.

The problem is that the state altered the photo (Ex. 210) of the black defendant and his black family, at dinner, by superimposing on it a quote highlighting race as some kind of important factor with the moniker, "niggers." There is no denying that this word is powerful, gripping, and emotional. But it was irrelevant—there was no indication of a racial motive in this case, and indeed, the victim apparently referenced was not even black. In context, placing that quote on that photograph of the defendant's black family did not just alter both pieces of evidence in violation of *Glasmann*. It also created imagery highlighting the defendant's race—his

blackness—in a case where that had absolutely no relevance. That alteration of the evidence is inflammatory, whether the prosecutor intended it or not.[2]

Similarly, the majority correctly criticizes the State for repeatedly using Walker's booking photo and presenting it once with the caption, "'We are going to beat this.'" Majority at 9 (emphasis and capitalization omitted) (quoting Pl.'s Ex. 243, at 89). The majority characterizes this and other slides as impermissibly "altered with inflammatory text." Majority at 8. To be sure, altering evidence on PowerPoint slides constitutes misconduct. *Glasmann*, 175 Wn.2d 696. But the quote *alone* would not be improperly damaging. It was a direct quotation that Ms. Williams-Irby attributed to Walker. 8 VRP at 781. The court admitted it without objection. *Id.* at 779. A trier of fact might interpret it as reflecting consciousness of

---

[2] I do not mean to suggest that only prosecutors are susceptible to making unintentional appeals to race—indeed, criminal defense lawyers and judges can be. *See, e.g., State v. Saintcalle*, 178 Wn.2d 34, 44-48 & n.3, 309 P.3d 327 (2013); L. Song Richardson & P. A. Goff, *Implicit Racial Bias in Public Defender Triage*, 122 YALE L.J. 122 (2013) (analyzing unconscious race bias in public defender decision-making). As our court stated in *Saintcalle*, 178 Wn.2d at 34, 42 n.1, "'[B]ias pervades the entire legal system in general and hence [minorities] do not trust the court system to resolve their disputes or administer justice evenhandedly.'" (Quoting TASK FORCE ON RACE AND THE CRIMINAL JUSTICE SYSTEM, PRELIMINARY REPORT ON RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM at 6 (2011) (second alteration in original), *available at* http://www.law.washington.edu/About/RaceTaskForce/preliminary_report_race_criminal_justice_030111.pdf (quoting WASH. ST. MINORITY & JUSTICE COMM'N, 1990 Final Report at xxi (1990), *available at* http://www.courts.wa.gov/committee/pdf/TaskForce.pdf); *see also Saintcalle*, 178 Wn.2d at 62 (Madsen, C.J., concurring)). The issue raised in this case, though, was prosecutorial misconduct.

guilt, so it is relevant to whether Walker committed the charged crimes. ER 401, 402. Once again, I think we should make clear that it is proper for the State to highlight that type of statement for the jury.

Nevertheless, I agree with the majority that all the slides of the booking photo were improper. I write separately to explain why.

The first problem is that in one slide, the quote was superimposed on the defendant's booking photo. This alters both the quote and the photo. The second problem is that the booking photo was never admitted into evidence in that form. According to the record we have been supplied with, the booking photo was used as a part—one-sixth—of the photo montage (Ex. 74A) that an independent witness viewed before *failing* to identify, and only later claiming to identify, the defendant's photo in position two as the driver of an Oldsmobile leaving Walmart after the murder. 5 VRP at 239-43. The montage was admitted (Ex. 74A). The booking photo was not. There was probably a good reason for that: booking photos are notoriously prejudicial and inflammatory and are generally admissible only if specifically relevant.[3] So the PowerPoint slide showed a doubly altered image—a

---

[3] *State v. Walter*, No. WD 76655,__ S.W.3d ___, 2014 WL 4976913 (Mo. App. W.D. 2014) at *17-18 ("Giving the State the widest possible latitude, there is still no rational justification for the prosecutor's use of the mug shot during closing argument. Showing Walter wearing an inmate uniform with the word 'GUILTY'

booking photo excised from a part of exhibit 74A with a superimposed quote. The next problem is that, in context, superimposing that text on a booking photo of the defendant from after the crime, looking disheveled, antisocial, and tough, highlights the defendant's appearance at booking. That is an irrelevant fact. Use of one of the many photos of the crime itself (*e.g.*, Exs. 30A-D, 31A-D, 32A-D, 33A-D, 34A-D,

---

prominently displayed across his face added nothing to the State's argument. Rather, the only purpose it could have served was to portray Walter in a negative light to the jury. Accordingly, the prosecutor injected incompetent and potentially prejudicial matters into its closing argument by displaying an altered piece of evidence to the jury for the sole purpose of affecting the jury's opinion of the defendant." (footnote omitted)); *State v. Lazo*, 209 N.J. 9, 19, 34 A.3d 1233 (2012) ("[a]rrest photos raise particular concerns, though, because they can inject prejudice by suggesting a defendant has a prior criminal record;" "an arrest photo may be admitted only if it is presented 'in as neutral a form as possible.'" (quoting *State v. Taplin*, 230 N.J. Super. 95, 99, 552 A.2d 1015 (App. Div.1988)); *Watters v. State*, 313 P.3d 243, 245, 247 (Nev. 2013) ("At trial, the State used a PowerPoint to support its opening statement to the jury. The presentation included a slide showing Watters's booking photo with the word 'GUILTY' written across his battered face." (citing *Glasmann* with approval and holding that this constituted prejudicial error)); *Arca v. State*, 71 Md. App. 102, 105-06, 523 A.2d 1064 (1987) (abuse of discretion to admit mug shots of defendant in a photo array where identity was not in issue); *Smith v. Rhay*, 419 F.2d 160, 164 (9th Cir. 1969) ("the introduction into evidence of 'mug shots' for purposes of identification has been held to be highly prejudicial. The Supreme Court of Washington has itself seen prejudicial inferences in the introduction of 'mug shots,' *State v. Devlin*, 145 Wash. 44, 258 P. 826 (1927) . . ." (citation omitted)); *Williams v. Commonwealth*, 810 S.W.2d 511, 513 (Ky.1991) (given prejudice posed by use of booking photos at trial, they are inadmissible unless "'(1) the prosecution [had] a demonstrable need to introduce the photographs; (2) the photos themselves, if shown to the jury, [did] not imply that the defendant had a criminal record; and (3) the manner of their introduction at trial must be such that it [did] not draw particular attention to the source or implications of the photographs.'" (quoting *Redd v. Commonwealth*, 591 S.W.2d 704, 708 (Ky. App. 1979))).

35A-D, or 36A-D) would have been far more relevant, but racial differences are not always clearly apparent in them.

Race is not a relevant fact in this case. It was a robbery-murder with a greed motive and a question about whether Mr. Walker, who was not present at the murder scene itself, orchestrated the crime and gave the kill order. The answer to that question was based mainly on witness credibility. Where credibility, not race, is the issue, such a powerful focus on race through altered evidence is error.

In sum, I agree with the majority that a digital media presentation highlighting the prosecutor's personal opinion about Walker's guilt over and above the evidence, throughout closing, constitutes error under *Glasmann*. But many of the items of evidence listed above, if left unaltered, would not fall into that category. They would be evidence, which is what the prosecutor is supposed to use in closing argument. It is the fact that the evidence was altered in a way that emphasized the prosecutor's opinion and—perhaps unintentionally—the defendant's race that caused the problem.[4]

---

[4] There are certainly no explicit appeals to racial bias anywhere in the record. But we have recognized that our State criminal justice system is not immune from unconscious, implicit, racial bias and that we need to devise strategies to deal with it. *Saintcalle*, 178 Wn.2d at 46-47 nn.3-6. We are not alone. The National Center for State Courts counsels that implicit bias is pervasive and operates without our awareness: "Unlike *explicit bias* (which reflects the attitudes or beliefs that one endorses at a conscious level), *implicit bias*

II.     The Elements Instruction Is Confusing Because It Allows the Jury To Convict One Alleged Participant in the Crime Based Solely On Another's Actions and Intent

I also respectfully disagree with the majority's endorsement of an elements instruction that is confusing. Whether an elements instruction should permit the jury to convict one defendant upon proof that "an accomplice," but not the defendant, had the prohibited intent and that "an accomplice," but not the defendant, committed a prohibited act is a question of first impression in our court. Based on our case law, we must conclude that such an instruction might be confusing and, hence, we should not endorse it.

The challenged elements instruction provides:

> To convict the defendant of the crime of premeditated murder in the first degree, [C]ount I, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1)     That on or about [the] 2nd day of June, 2009, *the defendant or an accomplice acted with intent* to cause the death of Kurt Husted;
>
> (2)     That the intent to cause the death was premeditated;

---

is the bias in judgment and/or behavior that results from subtle cognitive processes (e.g., implicit attitudes and implicit stereotypes) that often operate at a level below conscious awareness and without intentional control." NAT'L CTR. FOR STATE COURTS, HELPING COURTS ADDRESS IMPLICIT BIAS: FREQUENTLY ASKED QUESTIONS, http://www.ncsc.org/~/media/Files/PDF/Topics/Gender%20and%20Racial%20Fairness/Implicit%20Bias%20FAQs%20rev.ashx (last visited Jan. 8, 2015).

(3) That Kurt Husted died as a result *of the defendant's or an accomplice's acts*; and

(4) That any of these acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Clerk's Papers (CP) at 216 (emphasis added).

The majority identifies the issue as whether a single error in the elements instruction, which permitted the jury to "split" the elements of the crime between the defendant and a different participant, is improper. But the real issue is whether the double error shown by the elements instruction above, which actually permitted the jury to convict Walker even if he did nothing and a different participant was the only one harboring the prohibited mens rea and doing the prohibited acts, is improper.[5]

The answer to that question is that such an instruction can be read as relieving the State of the burden of proving that Walker harbored the intent or committed the acts required for murder. It can even be read to relieve the State of the burden of

---

[5] The majority's note 8 argues that given the amount of evidence against Walker, the jury could not possibly have convicted Walker on an improper basis. Majority at 19 n. 8. The majority is probably correct about this. But that just means that the error I discuss below was harmless. It was, however, still an error.

proving that Walker harbored the lesser mens rea of knowledge or committed the more limited act of "aid[ing]" required for accomplice liability. In fact, instruction 13 tells the jury that it could convict Walker even if a different participant had "intent to cause the death" but that Walker did not, and a different participant "acted" with that intent and committed "acts" causing death but that Walker did not. *Id.*

It is certainly true that under Washington law, a jury can convict a defendant as an accomplice even if that defendant does not have the same intent as the principal (or as any other participant) and who did not commit the same acts as the principal (or as any other participant). A jury can convict a defendant as an accomplice if that defendant is the one who "(1) solicits, commands, encourages, or requests another person to commit the crime; or (2) aids or agrees to aid another person in planning or committing the crime." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51 (3d ed. 2008); *see also* RCW 9A.08.20(3)(a)(i), (ii); *State v. Roberts*, 142 Wn.2d 471, 510, 14 P.3d 713 (2000); *State v. Cronin*, 142 Wn.2d 568, 576-77, 14 P.3d 752 (2000). It is not necessary for the accomplice's mens rea to match the crime's mens rea; a jury can convict a defendant as an accomplice even if that defendant has only "'*knowledge* that [his or her acts] will promote or facilitate the commission of a crime,'" not intent. *State v. Hoffman*, 116 Wn.2d 51, 104, 804 P.2d 577 (1991) (quoting *State v. Guloy*, 104

11

Wn.2d 412, 431, 705 P.2d 1182 (1985)). This means that a jury could convict Walker if he were "'present at the scene and ready to assist,'" *State v. Rotunno*, 95 Wn.2d 931, 933, 631 P.2d 951 (1981), even if he did not have premeditated intent to kill and did not himself commit the murder. In fact, a jury could convict Walker as an accomplice even if the principal was not prosecuted or convicted. RCW 9A.08.020(6); *accord State v. Cleman*, 18 Wn. App. 495, 499-500, 568 P.2d 832 (1977).

But a jury cannot convict Walker if he did nothing objectionable at all. The jury must find, at the very least, that he had knowledge of "the crime" to be committed and that he acted with knowledge that his conduct would promote or facilitate that crime. *Roberts*, 142 Wn.2d at 510-11; *Cronin*, 142 Wn.2d at 579 (conviction reversed); *State v. Evans*, 154 Wn.2d 438, 114 P.3d 627 (2005) (reversing felony murder; jury instruction allowed conviction on murder without finding he personally attempted or committed the robbery if it found he was only an accomplice to theft); *see also In re Pers. Restraint of Sarausad*, 109 Wn. App. 824, 835-36, 39 P.3d 308 (2001) (State must prove accomplice had knowledge of the crime to be committed, but the State does not have to prove that accomplice knew details of that crime, such as its degree or elements); *see generally State v. W.R.*, __ Wn.2d __, 336 P.3d 1134 (2014) (the due process clause requires the State to prove

all elements of charged crime—as defined by the applicable state statute—beyond a reasonable doubt).

A jury instruction stating that the jury could convict the defendant of premeditated murder even if someone else had the prohibited intent or knowledge and someone else committed the prohibited act or facilitation does not ensure that that standard is satisfied. That is why instruction 13 can be confusing.

It is true that instruction 13 requires the jury to find that the other participant who had the prohibited intent and committed the prohibited act was "an accomplice." CP at 216. Instruction 9 then defines "accomplice" as one who "either . . . encourages . . . *another person* to commit the crime; or . . . aids . . . *another person* in . . . committing the crime." CP at 212 (emphasis added). It doesn't say who the other person has to be, whether it has to be the defendant identified in the "to convict" instruction or one of the other participants, or what the definition of "another person" or "participant" is. In sum, the court's instructions require too many unclear cross-references to ensure that the jury concluded that Walker was a principal or an accomplice.

The majority and the Court of Appeals cite several decisions in support of their conclusions to the contrary and imply that those cases show that the wording of this elements instruction is well accepted in Washington law. One of these cases

13

is *State v. Mak*, 105 Wn.2d 692, 740, 718 P.2d 407 (1986), *overruled on other grounds by State v. Hill*, 123 Wn.2d 641, 870 P.2d 313 (1994) (cited by majority at 20). But the "to convict" instruction in *Mak* was strikingly different than the "to convict" instruction here. In *Mak*, the "to convict" instruction listed the following elements:

> "(1) That on . . . February, 1983, the defendant *or an accomplice* caused the death of the individual named;

> "(2) That the defendant acted with the intent to cause the death;

> "(3) That the defendant acted with premeditated intent to cause the death;

> "(4) That the death was a result of the acts of the defendant *or his accomplice*;

> "(5) That one or more of the following aggravating factors was present."

*Mak*, 105 Wn.2d at 740. There are two critical differences between *Mak* and this case. First, in *Mak*, the defendant did not raise and the court did not consider the issue raised here. The only challenge to accomplice liability raised in *Mak* was whether "the defendant could be convicted of aggravated murder in the first degree based on an accomplice theory." *Id.* at 739. Second, in *Mak*, the court added the words "or his accomplice" only to the elements involving the cause of death, not to the elements concerning intent. *See id.* at 744 (discussing the instruction with

14

approval in part because the words "or an accomplice" were added only to the elements concerning cause of death, not the elements concerning intent). Thus, the *Mak* elements instruction did not suffer the same infirmity as the elements instruction in this case.

Another case that the majority and the Court of Appeals cite to support the notion that a "to convict" instruction like the one used in this case is well accepted in Washington law is *State v. Hoffman*, 116 Wn.2d 51, 804 P.2d 577 (1991). Majority at 20; *State v. Walker*, 178 Wn. App. 478, 486-87, 315 P.3d 562 (2013). In *Hoffman*, this court made several general statements about accomplice liability that remain correct today, even after *Roberts* and *Cronin*, such as:

> [T]he accomplice liability statute predicates criminal liability on general knowledge of the crime and not on specific knowledge of the elements of the participant's crime. Accomplice liability represents a legislative decision that one who participates in a crime is guilty as a principal, regardless of the degree of the participation.

116 Wn.2d at 104 (footnote omitted).

But with respect to the particular issue about the correct phrasing of the elements instruction, *Hoffman* provides the majority with no help. The elements instruction in *Hoffman* actually required the jury to find that the defendant personally committed unlawful acts and personally harbored an unlawful intent before the jury

could convict him (the court defined "accomplice liability" in a separate instruction);

the elements instruction stated:

> "To convict a Defendant of the crime of Murder in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> "(1) That on or about the 27th day of August, 1986, the Defendant shot Louis A. Millard;
>
> "(2) That the Defendant acted with intent to cause the death of Louis A. Millard;
>
> "(3) That the intent to cause the death was premeditated;
>
> "(4) That Louis A. Millard died as a result of Defendant's acts; and
>
> "(5) That the acts occurred in Okanogan County, Washington."

*Id.* at 107-08. The elements instruction in this case was totally different. If the court

had used this *Hoffman* instruction, no error would have occurred.

Another case cited in support of the elements instruction used here is *State v.*

*Haack*, 88 Wn. App. 423, 958 P.2d 1001 (1997). *See* majority at 20; *Walker*, 178

Wn. App. at 486. In *Haack*, the Court of Appeals did state that a jury could convict

even if one participant in a group crime held one intent, another participant held

another intent, and different participants committed different acts with differing

levels of culpable intent or knowledge, causing different levels of harm. But the

court in *Haack* did not hold that a jury could convict a defendant without the State

proving that the defendant held any objectionable mens rea or committed any objectionable act at all. Instead, the *Haack* court stated,

> So long as the State proved beyond a reasonable doubt . . . that at least one of the participants intended to inflict great bodily harm and at least one but not necessarily that same participant inflicted great bodily harm during the attack on the victim, the jury with its differing viewpoints as to what actually happened could rationally convict all the participants of first degree assault, including Participant D, who struck no blows and who did not intend to inflict great bodily harm, *but who acted as a lookout to alert the remaining participants if the police should arrive.*

88 Wn. App. at 429 (emphasis added). Thus, the *Haack* court actually held that a jury cannot convict a defendant charged with the group's acts unless the State proves that that specific defendant is a "participant[]," that that specific defendant took actions to further the crime ("acted as a lookout"), and that that specific defendant took those actions to facilitate the crime ("to alert the remaining participants if the police should arrive"). *Id.* The elements instruction here contains none of these prerequisites to conviction.

Finally, the majority cites to *State v. McDonald*, 138 Wn.2d 680, 981 P.2d 443 (1999), as support for the either-or elements instruction given in this case. Majority at 20. But the only holding of the *McDonald* case with regard to accomplice liability is that accomplice and principal liability are not alternative means of committing the crime and hence they are not subject to our jurisprudence on jury unanimity regarding means of commission of a crime. 138 Wn.2d at 687-

17

88. Like the decisions cited above, the court in *McDonald* clearly required the State to prove that the defendant was a culpable ""'participa[nt]'"" in the crime and that the defendant facilitated the crime while having knowledge of the crime, "Here the jurors need not have decided whether it was Bassett or McDonald who actually killed Michael 'so long as both participated in the crime.' *State v. Hoffman*, 116 Wn.2d 51, 105, 804 P.2d 577 (1991)." *Id.* at 688. And, in fact, as the *McDonald* court described in detail, the State certainly bore that burden of proof in that case:

> Even if the jury concluded that *McDonald did not act as a principal when he shot Michael in the head*, it could have found that McDonald aided Bassett in the commission of a crime. *McDonald, by his own admission, shot Michael Bassett in the head while he was still alive.* Surely a more compelling example of participation in a crime could not be found. We have written that "it matters not that some jurors may have believed that the petitioner fired the gun, while others may have believed that his only role was in aiding and abetting [the other participant], so long as all twelve agreed that he did participate."

*Id.* at 690 (emphasis added) (alteration in original) (internal quotation marks omitted) (quoting *Hoffman*, 116 Wn.2d at 105).

I therefore respectfully disagree with the majority's statement that the elements instruction used in this case is well accepted by this court. I also disagree with its conclusion that the elements instruction accurately and clearly describes the law of accomplice liability for the jury. I think that it is far less confusing to instruct the jury on the elements of the crime in one instruction (without using the alternative

"or an accomplice" in that elements instruction) and to provide a definition of "accomplice liability" in a separate instruction. Each party can then argue its theory without fear that the jury will convict based upon association, rather than based upon the defendant's acts and knowledge.

III.   Conclusion

I agree with the majority's decision to reverse Walker's conviction due to prosecutorial misconduct. I respectfully disagree with its statements about the proper wording of an elements instruction in a case where the court also gives an accomplice liability instruction. The far better practice is to provide the jury with the elements of the crime in one instruction, without an either-or clause about who must commit those elements, and to provide the jury with the definition of "accomplice liability" in a separate instruction. I therefore concur.

Gordon McCloud, J.