# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Appellant,

v.

HAMZA ABDULLAH OSMAN,

Respondent.

No. 84364-8-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — A jury convicted Hamza Osman of assault in the second degree. Osman appeals his conviction arguing that the prosecutor committed misconduct in describing the "reasonable doubt" standard in closing argument. He also challenges the court's imposition of the Victim Penalty Assessment (VPA) and argues in his statement of additional grounds that he received ineffective assistance of counsel. We remand to the trial court to strike the VPA from his judgment and sentence, but otherwise affirm.

## FACTS

On the evening of October 16, 2020 Hani Farah[1] and their friend, Yasmina Aden, met up and decided to spend time together. The two had bonded over their shared

---

[1] Farah uses the pronouns they/them.

Citations and pincites are based on the Westlaw online version of the cited material.

Somali background and LGBTQ[2] identities.  Farah testified that Aden wanted to meet some Somali men.  Aden testified that Farah knew Aden did not like to hang out with Somali people, but that Farah assured her they were meeting someone who was "queer and trans-friendly who is also Somali."

Farah retrieved $500 from their apartment and the two eventually met up with Osman, who helped Farah purchase a bottle of whiskey from people selling it out of tents.  Aden testified that she drank a "couple of shots" and "blacked out," stating she was unable to remember anything between drinking and waking up shortly before a later car accident.

According to Farah's testimony, Osman drove the three to an area under a bridge in south Seattle where they hung out with several other people.  There, the group ran into a man they knew as "Canada," later identified as Zachary Mohammad.

Farah testified that Farah and Aden each had several alcoholic beverages before Farah noticed Aden was "flirtatious" with the men.  Farah became concerned that the men did not know Aden was transgender and worried how the men would react based on Farah's experiences with other Muslim and Somali men.  Farah testified that Osman told Farah he liked Aden before Farah saw Osman and Aden get into Aden's car together.  The two remained in the car alone together for between 15 and 20 minutes.  Osman then exited the car but his "demeanor had changed."  Farah assumed that Osman and Aden had a sexual encounter and that Osman discovered Aden's status as transgender.

Osman then offered to drive Farah and Aden home in Aden's vehicle, telling

---

[2] "LGBTQ" is an acronym for lesbian, gay, bisexual, transgender, and queer or questioning.

Farah to sit in the front seat while Aden and Canada sat in the backseat.  According to Farah, Farah saw Osman put on brass knuckles containing "spikes" after putting his hand in his jacket pocket.  As Osman drove, he began hitting Farah in the face while wearing the brass knuckles and asking if Farah thought he was gay.  Osman continued to hit Farah while driving before stopping at an empty park where Osman got out of the car, opened the front passenger door and pulled Farah out of the car.  Farah claimed that Osman pulled Farah to the ground, began to beat Farah, demanded Farah's cash and dug through Farah's pockets to take the $500 and throw away Farah's cell phone.  Aden attempted to get out of the car but Osman told Canada to put Aden back in the car.

Farah explained that Osman put Farah back in the car and attempted to rob Aden, but Aden did not have any cash.  Osman then drove Farah and Aden to a Wells Fargo ATM, but Aden was unable to withdraw any money.  Farah testified that Osman continued to drive both of them around, holding them "hostage" until the early morning hours.

While Osman drove, Farah observed a sheriff's vehicle on the street and saw a woman in a parked car.  Farah saw it as a chance to escape.  Farah grabbed the wheel in order to crash into the parked vehicle to get the sheriff's attention then got out of the car and yelled to the sheriff that Osman was hurting Farah.

Aden testified that the next thing she remembered after blacking out was that she was in the back of her car with someone sitting next to her and hitting her, while someone else was driving and hitting Farah multiple times in the face.  Aden told the driver to stop hitting her friend.  Then Aden's car hit another car.  Aden testified that she

3

thought the men in the car were the same men she met earlier in the night, though she would not be able to recognize them.

After Farah grabbed the wheel, Aden's vehicle crashed into another vehicle driven by Carla Vicari, who was stopped at a stoplight while Osman attempted a right turn in Aden's vehicle. Vicari had a clear view into Aden's vehicle after the collision and observed someone attempting to exit the front passenger door and a man in the driver's seat pulling that person back into the vehicle twice.[3] Vicari then saw the man in the driver's seat get out of the vehicle, grab what appeared to be a bottle of alcohol and say "I'm sorry. Her fault" before running away. Vicari observed another man exit the back of the vehicle and run in the other direction. Vicari testified that the person in the front passenger seat got out of the car appearing afraid and panicked and shouting for someone to call the police.

Seattle police arrived on scene and observed Farah with injuries and swelling to their face, but did not observe any bleeding or cuts. Farah initially refused medical attention, but later acquiesced and was taken to a hospital. Farah identified Osman from a photo as the man who hit Farah. Near the end of the police investigation on the scene, an officer allowed Farah access to the vehicle in order to retrieve Farah's things before the car was towed. While the officer was speaking to another person at the scene, Farah claimed that Farah had found brass knuckles inside the vehicle and held them up. The officer told Farah to return them where Farah had found them to be collected by investigators. The officer did not initially see where the brass knuckles

---

[3] Vicari testified that at the time of the initial collision she could not identify the gender of the front passenger or driver, but was later able to describe the driver as a man and the front passenger as appearing female.

were located prior to Farah holding them up.

The officer who had responded to the scene found Osman three days later and arrested him. Osman was charged with one count of robbery in the first degree and one count of assault in the second degree.

In closing arguments, the prosecution stated,

Each of these crimes must be proved beyond a reasonable doubt. And though this burden is high, it is not impossible to meet. The standard does not require you to find that the State proved each element beyond all doubt or beyond a speculative doubt. The only way you can know something beyond all doubt is if you were there to witness this first-hand, and if that were the case, you would be sitting there on this witness stand rather than here in the jury box.

The standard contemplates that you as jurors are not first-hand observers of these events. The law recognizes these limitations exist, and that's why the standard is beyond a reasonable doubt. And a reasonable doubt is a doubt that would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence. It's a doubt for which a reason exists. So it can't just be any doubt. There must be a reason for it. And this standard only applies to the elements of these offenses.

The defense objected to the prosecution's explanation of the reasonable doubt standard, but was overruled. The jury found Osman not guilty of robbery in the first degree, but guilty of assault in the second degree. The trial court sentenced Osman to 13 months' imprisonment and 18 months of community custody, and imposed the $500 VPA.

Osman appeals.

DISCUSSION

Prosecutorial Misconduct

Osman contends that the prosecutor in closing argument misstated the burden of proof and unfairly shifted the burden onto the defendant by arguing that the prosecutor

said "there must be a reason" for the jurors to have a reasonable doubt. We disagree.

Prosecutors have "'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'" State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (quoting State v. Gregory, 158 Wn.2d 759, 841, 147 P.3d 1201 (2006), overruled in part on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014)). A prosecutor "commits misconduct by misstating the law." State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 286 (2015). To prevail on a claim of prosecutorial misconduct, a defendant must show that "in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

Once a defendant establishes that a prosecutor's statements are improper, we determine whether the defendant was prejudiced. If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653, 664 (2012). Where a defendant fails to object, we apply a heightened prejudice standard, requiring the defendant to show that the prosecutor's misconduct was "so flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice." State v. Loughbom, 196 Wn.2d 64, 70, 470 P.3d 499 (2020) (quoting State v. Walker, 182 Wn.2d 463, 477, 341 P.3d 976 (2015)). If the defendant is unable to meet this heightened prejudice standard, he is deemed to have waived any error. Emery, 174 Wn.2d at 760-61 (citing State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)). Essentially, a defendant who did not object at trial

must show the improper conduct resulted in "incurable" prejudice.  State v. Zamora, 199 Wn.2d 698, 709, 512 P.3d 512 (2022).

We review the prosecutor's conduct and whether prejudice resulted from it "by examining that conduct in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'"  State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotation marks omitted) (quoting State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

Osman argues that the prosecutor's statements are akin to a "fill-in-the-blank" argument previously found improper by this court.  See State v. Johnson, 158 Wn. App. 677, 243 P.3d 936 (2010).  In Johnson, the prosecutor told the jury "to be able to find reason to doubt, you have to fill in the blank, that's your job."  Id. at 682.  This court has also found improper similar arguments telling the jury it is required to "fill in the blank" or to articulate a reason for their doubt before finding a defendant not guilty.  State v. Anderson, 153 Wn. App. 417, 431, 220 P.3d 1273 (2009) ("in order to find the defendant not guilty, you have to say 'I don't believe the defendant is guilty because,' and then you have to fill in the blank."); State v. Venegas, 155 Wn. App. 507, 523, 228 P.3d 813 (2010) ("In order to find the defendant not guilty, you have to say to yourselves: 'I doubt the defendant is guilty, and my reason is'—blank.").

In the context of the entirety of the prosecutor's argument, the challenged statement does not amount to a prohibited "fill-in-the-blank" argument.  The prosecutor correctly explained that each crime must be proved beyond a reasonable doubt and correctly defined a reasonable doubt as "a doubt that would exist in the mind of a

7

reasonable person after fully, fairly, and carefully considering all of the evidence." The statement was made in the context of explaining that a reasonable doubt was not just any doubt and that the prosecution was not required to prove the elements of the crime beyond *all* doubt. The prosecutor went on to say that Osman is presumed innocent and that presumption remains in effect unless the jury "find[s], during [their] deliberations, that the presumption has been overcome by the evidence beyond a reasonable doubt."

The context of the argument shows that the prosecutor was not attempting to tell the jury that they were required to articulate a specific reason before they could find the defendant not guilty, but to explain what a reasonable doubt was and that in order to find the defendant not guilty, the jury must have a reasonable doubt as to an element of the crime. The jury also had the benefit of the court's correct explanation of reasonable doubt in the jury instructions. The court instructed the jury that the State has the burden of proving each element of the crime beyond a reasonable doubt and that

> [a] reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence.

In context, the prosecutor saying "[t]here must be a reason for it" was another way of saying a reasonable doubt is one for which a reason exists. Unlike the prosecutors in Anderson and Venegas, the prosecutor in the instant case did not suggest jurors have to articulate the reason.

Even if the prosecutor's statement was improper, Osman would not be able to show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. Emery, 174 Wn.2d at 760. Osman argues that

8

his assault conviction only rested on the testimony of Farah, which the jury rejected as evidenced by finding Osman not guilty of robbery in the first degree. But evidence other than Farah's testimony supported the assault conviction. Alongside Farah's testimony and identification of Osman as the assailant, the jury heard the responding officer's description of Farah's injuries and viewed the brass knuckles recovered from the vehicle. The jury also heard testimony from Aden that she had observed the man in the driver's seat of the vehicle hitting Farah multiple times. Another witness, Vicari, testified to seeing the man in the driver's seat twice pull Farah back into the car after Farah opened the front passenger door and attempted to exit the car. Vicari also testified that Farah appeared afraid and panicked, shouting for anyone to call the police.

We conclude that in the context of the State's closing argument, the evidence presented to the jury, and the trial court's instructions to the jury, the prosecutor's statement did not amount to a prohibited "fill-in-the-blank" argument and was not improper or prejudicial.

Victim Penalty Assessment

Osman argues in supplemental briefing that this court should strike the $500 VPA imposed on Osman as a mandatory fee at the time of sentencing. The State agrees.

Under RCW 7.68.035(4), enacted in July 2023, trial courts are required to waive the VPA if the defendant is indigent as defined in RCW 10.01.160(3). This court has applied this waiver to cases pending direct appeal at the time the law went into effect. See State v. Ellis, No. 56984-1-II, slip op. at 12 (Wash. Ct. App. June 13, 2023), https://www.courts.wa.gov/opinions/pdf/D2%2056984-1-II%20Published%20Opinion.pdf

(citing State v. Ramirez, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018)).

The State acknowledges that, had the trial court conducted the now-required indigency analysis before imposing the VPA, it would have found Osman indigent as defined in RCW 10.01.160(3). The State further observes that under the current version of RCW 7.68.035,

> upon motion by a defendant, the trial court must waive any VPA imposed prior to July 1, 2023, if the defendant does not have the ability to pay it, and a defendant by definition does not have the ability to pay if they are indigent. RCW 7.68.035(5).

It is under this circumstance that the State agrees that a remand to strike the VPA is appropriate. The State concedes that Osman is indigent and entitled to relief. We agree and remand to the trial court to strike the VPA imposed upon Osman.

### Ineffective Assistance of Counsel

Osman next argues in a statement of additional grounds that his counsel was ineffective. Osman contends that his counsel "recklessly disregarded [Osman's] prior strategic and tactical decisions" by stating in opening and closing arguments that the victim was not hit with brass knuckles and was only punched. Osman argues that his counsel admitted this in an attempt to avoid a conviction for a more serious offense. We disagree.

To show ineffective assistance of counsel, Osman must establish that his counsel's performance was both deficient and resulted in prejudice. State v. Grier, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011); Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). When counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as the basis for a claim of ineffective assistance. State v. Prado, 144 Wn. App. 227, 248, 181 P.3d 901

10

(2008).

The record reflects that the defense did not concede that the victim had been punched. Defense counsel stated only that the victim had alleged Osman had punched them with brass knuckles. The defense made no statement or admission in its opening statement that Osman had actually committed any assault. The record similarly reflects that the defense counsel also did not make such a statement in closing. Defense counsel instead argued that Farah's story that Osman used brass knuckles did not make sense given the type of injuries and the lack of blood on the brass knuckles and argued the evidence did not clearly show the brass knuckles in the car before Farah found them. There is nothing in the record to support Osman's assertion that his counsel admitted Osman committed any unlawful act. Osman has failed to show that his counsel's performance was deficient.

## CONCLUSION

We remand for the trial court to strike the imposition of the VPA, but otherwise affirm.

_Coburn, J._

WE CONCUR:

_Feldman, J._          _Birk, J._

11