IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77422-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BRUCE ALLEN MONROE, | ) | |
| | ) | |
| Appellant. | ) | FILED: September 30, 2019 |
| | ) | |

ANDRUS, J. — Bruce Allen Monroe challenges his conviction for second degree assault, contending that both the jury instructions and the prosecutor misstated the law of self-defense. We affirm.

## FACTS

The State charged Monroe with second degree assault after Monroe pointed his pistol at his neighbor's boyfriend following a quarrel over the fence separating their backyards. Monroe pleaded self-defense and defense of his wife, Roberta ("Bobbi") Monroe. Although Monroe did not testify at trial, Bobbi[1] did, as did the neighbor, Jennifer Smith, and her boyfriend Skyler Marquis.

The Monroes lived next door to Jennifer for over seven years. A fence and a retaining wall separated their backyards. The retaining wall is approximately

---

[1] For clarity, we refer to the individuals who testified by their first names. No disrespect is intended.

three and a half feet tall, and the Monroes' property sits above Jennifer's property. Bobbi testified that to keep her and Jennifer's dogs from "getting at each other," she laid down some landscaping fabric, covered it with beauty bark, and closed a two-inch gap between the wall and fence with bricks.

On September 10, 2016, Jennifer and Skyler, who lived with Jennifer, were cleaning their backyard and noticed Bobbi's landscaping fabric sticking out between the retaining wall and the fence. Skyler thought it looked ugly so he decided to push the fabric back onto the Monroes' property. Skyler used his fingers and then a flat-blade shovel to push the fabric under the fence. Jennifer and Skyler continued to work in the yard for another 20 to 30 minutes before going back inside.

Jennifer's children then heard Monroe yelling. Shortly thereafter, Monroe and Bobbi came to her front door. Monroe was angry, and Bobbi was crying and kept saying, "I thought we were friend[s]. How could you do this to me?" When he heard yelling, Skyler came to the door to make sure everything was okay.

According to Jennifer, once Monroe saw Skyler, he tried to instigate a fight. Monroe called Skyler a "faggot," a "pussy," and a "motherfucker," and challenged him to come outside to fight, proclaiming, "I'll fucking fight you, you fucking faggot." Monroe threatened to call the Navy and get Skyler kicked out of Jennifer's home because he thought Skyler was living there illegally.[2]

---

[2] Jennifer initially lived in the home with her husband, Corey Smith, who is in the Navy. At some point, Jennifer filed for divorce, which was still pending during this matter, and then began dating Skyler in September 2015. Skyler moved into the home with Jennifer and her two daughters in January 2016.

Skyler repeatedly asked Monroe to leave, but Monroe kept challenging Skyler to a fight. Jennifer said Skyler raised his voice at Monroe, but explained that he had to do so to be heard over Monroe's yelling. Skyler stepped between Monroe and Jennifer when Monroe's yelling and body language escalated. When Monroe left, Skyler went into the house to console Jennifer's daughters, who were alarmed by the confrontation. Bobbi stayed to talk to Jennifer. She asked Jennifer why she moved the landscaping fabric and "how [Jennifer] could do something like this to her."

A few minutes after Bobbi left, Jennifer and Skyler heard some noise outside. When they went outside, Skyler saw Monroe holding a crowbar, standing next to a partially demolished fence. Skyler asked Monroe what he was doing, and Monroe said he was "taking down the fucking fence." Skyler told Monroe that he needed to put the fence back up and that they needed to call the homeowners' association (HOA). Monroe waved the crowbar at Skyler and told him he would "kick [his] ass." Skyler testified that Monroe

> told me he knew where I . . . worked and that I was going down and that I was a piece of shit and a fairy fagot [sic]. He kept calling me a pussy. He kept trying to get me to come towards him to fight him. I was standing at least a good 15 feet behind my house so there was a good 30, 40 feet—or yards between us. He then continued to scream at me, call me names, call me a fagot [sic] at least four or five times.

While Monroe cussed at Skyler, Monroe noticed a pickaxe leaning against the retaining wall in Jennifer's yard and started "whacking at the handle of the pickaxe," as if he were trying to knock it over.

Skyler went inside to call 911. Skyler testified that the responding officers talked to Monroe first and then came to their door to talk about the situation. Skyler told the officers Monroe could not take down the fence without the HOA's permission. But the officers "said we were acting like a bunch of 12-year-olds and that [Monroe] had the right to take down the fence and that he was most likely going to."

After the officers left, Jennifer was concerned about not having a fence between the properties, and Skyler wanted to let the HOA know that Monroe was taking down the fence that separated the homes, so they called the HOA. The HOA advised them to take photos of Monroe taking down the fence.

Skyler went outside to take photos using his sky blue iPhone. Skyler said he told Monroe he was taking photos for the HOA. In some of the photos, Bobbi is pictured holding a fence panel as Monroe cuts the panel off the posts using a power saw. Monroe continued to threaten Skyler and yelled that he was going to call the Navy and that the Navy would kick Jennifer out of her house. Skyler looked down at his phone to see if he was getting good photos, and when he looked back up, Monroe was pointing a gun at him. Skyler asked him, "[I]s that a gun?" to which Monroe replied, "Yes, and I have more of them." Of the photos Skyler took, one shows Monroe holding a gun in his hand and one shows him pointing the gun at Skyler.

When Skyler came back in the house, Jennifer saw that he was visibly shaken and upset. Skyler testified that he was afraid, and he believed that if he

had stepped forward or made a wrong move, Monroe would have fired the gun at him.

Bobbi described a different series of events. She testified that when she went into the yard to pull weeds that day, she discovered that her landscaping had been damaged. She saw broken bricks and beauty bark scattered two feet away from the fence. She told Monroe what she had seen, and the two went over to Jennifer's house to ask her if she had any idea what had happened.

When Jennifer answered the door, Bobbi asked her if she knew who made the mess in the backyard. Jennifer denied knowing what Bobbi was talking about. Then, according to Bobbi, Skyler jumped up and ran to the door, pushed Jennifer aside, and claimed responsibility for the damage. Bobbi said that Skyler was angry, that he threatened her, and that she felt scared.

At that point, again according to Bobbi, Monroe—who had been waiting on the sidewalk—walked toward the porch and told Skyler not to talk to his wife that way. Bobbi testified that Skyler threatened Monroe, calling him a "fucking asshole." She stated that Skyler told Monroe to "[c]ome and beat me up," to which Monroe replied, "Come back over to my yard and let's have it out." After this exchange, Bobbi said that her husband walked away.

Bobbi stayed behind to talk to Jennifer. She said she asked Jennifer, "Why are you doing this to me? We've been friends for a long time. Why would you do this to me? You could have let me know if I had—if you had an issue with the backyard, I would have fixed it."

When Bobbi got home, she testified that she and her husband called the police because Skyler "was threatening us—he was threatening us and we needed to settle this—this harassment." Bobbi said they called the police because she feared for her life.

Bobbi and Monroe then started to take the fence down. Their plan, according to Bobbi, was to lower the fence to the ground to keep the landscaping fabric from moving over to Jennifer's side of the fence. According to Bobbi, while she and Monroe were working, Skyler came outside and brandished a pickaxe at them, cussed at them and tried "to harass" them by insisting that they keep the fence the way it was and by calling Monroe a "fucking asshole." Skyler and Jennifer both denied that Skyler ever threatened Monroe with the pickaxe.

Officer Kelly Pitts responded to what was the first of two 911 calls that day. He testified that during the first interaction, Monroe did not report any threats of violence from Skyler. Bobbi admitted that she never told the officers that Skyler had threatened her and her husband. Monroe told Officer Pitts that he had paid to put up the fence and wanted to take it down. Bobbi testified that the officers told Monroe that he could take down the fence.

According to Officer Pitts, when he spoke to Skyler about the fence, he was "pretty angry" and "pretty upset about the situation," but he was not yelling. He explained to Skyler and Jennifer that Monroe could take down the fence if he wanted to because it was his fence. Officer Pitts thought the confrontation was just a common, benign neighbor dispute and admitted that he thought it was a little silly.

After the police left, Bobbi and Monroe decided that, given the current conditions, "it would be best if we had the gun on—the gun carried in the holster for protection." Even though Bobbi said that she was scared, terrified, and afraid that Skyler might attack her, they went back outside to finish taking down the fence.

Bobbi held the panels in place while Monroe used a power saw to cut the fence off the posts. Out of the corner of her eye, Bobbi said she saw Skyler moving some kind of object that she thought was a gun. Fearing for her life and her husband's, she told Monroe, "Oh, my God, it's a gun." Bobbi said that Monroe dropped the power saw, stood up, and pulled the pistol out of its holster and held it by the side of his leg; she testified she did not see him wave the gun in the air. She testified that she heard Skyler ask, "Bruce, is that a gun?"

But when Bobbi turned around to face Skyler, she saw that he was holding a phone, not a gun, and that he was on his patio using his phone to take photos. Bobbi admitted that it only took a couple of seconds to realize that Skyler was actually holding a phone. When she realized Skyler was not armed, Bobbi calmed down.

Skyler called 911 again. Officer Brad Smith was the point person for the second 911 call, and he contacted Skyler and Jennifer first. Officer Smith testified that Skyler showed him a photo on his iPhone that showed Monroe pointing a pistol at him.

Officer Smith then went next door to speak to Monroe. According to Officer Smith, Monroe did not say why he decided to carry his pistol. Officer Smith described Monroe's initial demeanor as calm, but Monroe became visibly angry,

"kind of shaking and clenching his jaw and stuff," when Officer Smith mentioned that his decision to arm himself escalated the situation. Monroe claimed Skyler was the one who had escalated the situation without explaining how he had done so.

Officer Smith testified that when he asked Monroe if he pointed the pistol at Skyler, Monroe denied drawing the pistol at all. Only when Officer Smith told Monroe about the photo of Monroe pointing the pistol did Monroe admit that he drew the pistol from the holster because he was frightened by a black item in Skyler's hand. Even then, he still denied pointing the pistol at Skyler.

The jury convicted Monroe of second degree assault, and the court sentenced him to 5 months confinement, with credit for time served, and 12 months of community custody. Monroe appeals.

## ANALYSIS

Monroe challenges the adequacy of the self-defense jury instructions. He also argues the prosecutor misstated the law of self-defense during closing arguments, thereby relieving the State of its burden to prove the absence of self-defense or defense of others beyond a reasonable doubt. Lastly, Monroe claims that the cumulative errors denied him his constitutional right to a fair trial.

A. Jury Instructions

We review alleged errors of law in jury instructions de novo. State v. Sibert, 168 Wn.2d 306, 311, 230 P.3d 142 (2010). The trial court provided five instructions of relevance to this appeal.

Instruction 6 defined assault consistent with the third paragraph of Washington Pattern Jury Instruction (WPIC) 35.50,[3] with one exception. The instruction provided:

> An assault is an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

The pattern instruction includes the words "with unlawful force" in brackets after the word "act" in the first line of the instruction. The Note on Use for WPIC 35.50 provides, "Include the phrase 'with unlawful force' if there is a claim of self-defense or other lawful use of force.'" WPIC 35.50, at 582. Monroe neither requested that the bracketed language be included in Instruction 6 nor proposed his own version of WPIC 35.50. And he did not object to Instruction 6.

Instruction 7 mirrored WPIC 35.12—the "to convict" pattern instruction for second degree assault:

> To convict the defendant of the crime of assault in the second degree, each of the following two elements of the crime must be proved beyond a reasonable doubt;
>
> > (1) That on or about the 10th day of September, 2016, the defendant: assaulted Skyler Marquis with a deadly weapon; and
> >
> > (2) That this act occurred in the State of Washington.
>
> If you find from the evidence that element (1) and element (2) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

---

[3] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.50 (4th ed. 2016) (WPIC).

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to either element (1) or (2), then it will be your duty to return a verdict of not guilty.

Monroe proposed a completely different "to convict" instruction—one that incorporated the definition of assault and self-defense as separate elements of the crime:

> To convict Mr. Monroe of the crime of assault in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That on or about September 10, 2016, Mr. Monroe acted with a deadly weapon;
>
> (2) While not acting in defense of himself or others;
>
> (3) With the intent to create in Skyler Marquis apprehension and fear of bodily injury;
>
> (4) Which in fact created in Skyler Marquis a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury; and
>
> (5) That this act occurred in . . . Snohomish County, State of Washington.

Monroe took exception to the trial court's rejection of his proposed "to convict" instruction and objected to Instruction 7 because it did not incorporate the definition of assault and self-defense as elements.

Instruction 10, based on WPIC 17.02, provided:

> It is a defense to a charge of Assault in the Second Degree that the force offered to be used was lawful as defined in this instruction.
>
> The offer to use force upon or toward the person of another is lawful when offered by a person who reasonably believes that he is about to be injured or by someone lawfully aiding a person who he reasonably believes is about to be injured in preventing or attempting

to prevent an offense against the person, and when the force is not more than necessary.

The person offering to use the force may employ such means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the force offered to be used by the defendant was not lawful. If you find that the State has not proved the absence of this defense beyond a reasonable doubt in this case, it will be your duty to return a verdict of not guilty as to Assault in the Second Degree.

Instruction 11, based on WPIC 17.04, provided:

A person is entitled to act on appearances in defending himself or another, if he believes in good faith and on reasonable grounds that he or another is in actual danger of injury, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

And Instruction 12, based on WPIC 17.05, provided:

It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force.

The law does not impose a duty to retreat. Retreat should not be considered by you as a "reasonably effective alternative."

Monroe did not object to any of these instructions.

Monroe contends the erroneous jury instructions deprived him of the right to a fair trial, a due process violation. Due process requires a criminal defendant be convicted only when every element of the charged crime is proved beyond a reasonable doubt. State v. O'Hara, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). To satisfy the demands of a fair trial, the instructions, when read as a whole, must correctly tell the jury of the applicable law, not be misleading, and permit the

- 11 -

defendant to present his theory of the case. Id. This requirement also applies to a self-defense instruction to the extent that the instruction creates an additional fact the State must disprove beyond a reasonable doubt. Id. To determine whether the jury instructions given here rise to an error of constitutional magnitude, "we must examine whether the instruction omitted an element so as to relieve the State of its burden or merely failed to further define one of those elements." Id.

Monroe raises three instructional arguments. First, he argues the trial court did not accurately define "assault" because it failed to include the words "with unlawful force" in Instruction 6. Second, Monroe contends that because self-defense was not included as an element in Instruction 7, the "to convict" instruction, the State was relieved of its burden to prove the absence of self-defense beyond a reasonable doubt. Third, Monroe argues Instructions 6 and 7 contradict Instruction 10, making the instructions confusing for the jury. We reject these arguments.

### 1. Instruction 6

Monroe did not object to the trial court's failure to include the bracketed phrase "with unlawful force" in Instruction 6. His only objection was that the definition of assault was not included within Instruction 7 as a separate element of the crime. He did not propose a jury instruction defining "assault" as requiring the use of "unlawful force," the language he now contends was necessary. Thus, Monroe did not preserve this argument for appeal.

We may refuse to review any error that a defendant did not preserve in the trial court unless the claimed error is a "manifest error affecting a constitutional

right." RAP 2.5(a). Monroe must "'identify a constitutional error and show how the alleged error actually affected [his] rights at trial.'" O'Hara, 167 Wn.2d at 98 (quoting State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007)). A jury instruction that misstates the law on self-defense is not a per se error of constitutional magnitude; instead, appellate courts must make this determination on a case-by-case basis. Id. at 101.

State v. O'Hara is instructive. In that case, the defendant claimed he struck the alleged victim with a flashlight because the victim punched him in the forehead when the defendant tried to grab his car keys from the victim's hand. Id. at 95. The trial court instructed the jury that the use of force was lawful if O'Hara reasonably believed the victim was maliciously interfering with his property. Id. at 106-07. But the trial court provided an incomplete definition of "malice." Id. at 96, 104-05. Nevertheless, the Supreme Court held that failing to provide the full statutory definition of "malice" was not an error of constitutional magnitude. Id. at 104-05. It reasoned that because the trial court correctly instructed the jury that O'Hara's actions were justified if he was acting in self-defense of his person or property, and correctly instructed the jury that O'Hara was justified in using reasonable force if he reasonably believed that the victim was maliciously interfering with O'Hara's property, the State was not relieved of its burden of proof, and the incomplete "malice" definition "was, at most, a failure to further define one of the elements." Id. at 105-07.

This case is analogous to O'Hara. The trial court correctly instructed the jury on the law of self-defense. Instruction 10 told the jury that it was a defense to

the charge that the use of force was "lawful." Instruction 10 defined "lawful force" correctly, and it made it clear that the State bore the burden of proving beyond a reasonable doubt that the force used was not lawful. While it would have been appropriate to include the words "with unlawful force" in Instruction 6, omitting the phrase, in light of the clear definition of lawful force in Instruction 10, is more akin to the failure to further define an element of the crime, as was found in O'Hara, than the failure to identify an element of the crime. Omitting the words "with unlawful force" from Instruction 6 is not an error of constitutional magnitude, and we decline to review this error for the first time on appeal.

### 2. Instruction 7

Next, Monroe argues that self-defense is an element of the crime of second degree assault and, as such, should have been included in the "to convict" Instruction 7.[4] We review the sufficiency of this jury instruction de novo. State v. Walker, 182 Wn.2d 463, 481, 341 P.3d 976, cert. denied, __ U.S. __, 135 S. Ct. 2844, 192 L. Ed. 2d 876 (2015). Jury instructions are insufficient if they relieve the State of its burden to prove every essential element of the charged crime. Id.

In State v. Hoffman, 116 Wn.2d 51, 109, 804 P.2d 577 (1991), our Supreme Court rejected the argument that self-defense must be included as an element of the charged crime in the "to convict" instruction. It explicitly approved the method of giving a separate self-defense instruction—the method recommended by the Washington Supreme Court Committee on Jury Instructions. Id.

---

[4] Monroe preserved this issue for appeal. He argued below that under State v. Acosta, 101 Wn.2d 612, 683 P.2d 1069 (1984), the lack of self-defense should be an element of the "to convict" instruction "to clearly communicate to the jury what the State must prove." The trial court rejected this argument.

Monroe argues, however, that Hoffman has effectively been overruled by subsequent Supreme Court decisions. He contends that three cases "stand in direct contradiction to Hoffman"—State v. Sibert, 168 Wn.2d 306, 230 P.3d 142 (2010), State v. Smith, 131 Wn.2d 258, 930 P.2d 917 (1997), and State v. Acosta, 101 Wn.2d 612, 683 P.2d 1069 (1984).

Taking the cases in chronological order, the Supreme Court held in Acosta that due process requires the State to disprove self-defense in order to prove that a defendant, charged with second degree assault, acted unlawfully. 101 Wn.2d at 616. Acosta, of course, predated Hoffman and thus could not have overruled it. In fact, the Supreme Court cited Acosta in Hoffman. 116 Wn.2d at 109 n.84. This strongly suggests the Supreme Court did not find any contradiction between the holdings of the two cases. Acosta does not undermine the holding of Hoffman.

In Smith, the Supreme Court held that a conspiracy "to convict" instruction failed to list all the elements of the crime because it erroneously referred to the wrong subordinate crime to the conspiracy. 131 Wn.2d at 263. The State conceded this error. Id. at 262. Smith makes no mention of Hoffman. Furthermore, we see a clear distinction between an error in identifying the subordinate crime and correctly setting out the law on self-defense but doing so in a separate instruction. Thus, we see no contradiction between Smith and Hoffman. See also State v. Meggyesy, 90 Wn. App. 693, 696-97, 958 P.2d 319 (1998) (rejecting argument that Smith overruled Hoffman), abrogated on other grounds by State v. Recuenco, 154 Wn.2d 156, 110 P.3d 188 (2005), rev'd and

remanded, Washington v. Recuenco, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006).

Finally, in Sibert, the Supreme Court recognized that in a drug prosecution, the "to convict" instruction must contain the identity of a controlled substance when the type of drug involved increases the maximum sentence. 168 Wn.2d at 311-12. But it held that where the jury instructions incorporated the drug identity—methamphetamine—by reference to the charging document and where methamphetamine was the only drug proven at trial, it was not error to omit the identity of the controlled substance from the "to convict" instruction. Id. at 309-10. This holding is consistent with Hoffman—the court need not include self-defense in the "to convict" instruction as long as all of the instructions taken together properly instruct the jury on the applicable law. 116 Wn.2d at 109. Again, we see no contradiction between Sibert and Hoffman.

Furthermore, neither Smith nor Sibert explicitly overrules the holding of Hoffman. Once our Supreme Court has decided an issue of state law, that interpretation is binding on all lower courts until it is overruled by that court. State v. Gore, 101 Wn.2d 481, 487, 681 P.2d 227 (1984). We are reluctant to conclude that more recent Supreme Court cases have, by implication, overruled an earlier precedent and will instead adhere to the practice of following the case that directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions. See Agostini v. Felton, 521 U.S. 203, 237, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997).

### 3. Instruction 10

Lastly, Monroe argues Instructions 6 and 7 contradict Instruction 10 because the first two instructions informed jurors they had to convict if they found Monroe intentionally used force and caused Skyler to be reasonably afraid, but then Instruction 10 informed jurors they had to acquit if they found the State had failed to disprove self-defense beyond a reasonable doubt. We disposed of a similar argument in Meggyesy. There, we held that the self-defense instructions supplemented the preceding "to convict" instruction and were not contradictory. 90 Wn. App. at 706. As in Meggyesy, Instructions 6 and 7 preceded Instruction 10 and informed the jury that it had a duty to convict Monroe if the State proved the elements of second degree assault. Instruction 10 then supplemented Instructions 6 and 7 and further instructed the jury that if the State was unable to prove the absence of self-defense, the jury must acquit Monroe. We find nothing contradictory in the instructions.

Based on the foregoing, we conclude that the jury instructions were not erroneous.

### B. Prosecutorial Misconduct

Next, Monroe argues the prosecutor committed misconduct in closing arguments by stating that Monroe had a duty to retreat inside his home, by suggesting that carrying a pistol was an act of unlawful force, and by arguing that the self-defense analysis should include whether Monroe's conduct earlier in the day was reasonable.

To establish that the prosecutor's closing arguments constitute misconduct, Monroe must prove that the prosecutor's remarks were both improper and prejudicial. State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). "In reviewing a prosecutorial misconduct claim, we generally afford the State great latitude in making arguments to the jury." State v. Sublett, 156 Wn. App. 160, 185, 231 P.3d 231 (2010), aff'd on other grounds, 176 Wn.2d 58, 292 P.3d 715 (2012). A prosecutor's statements are improper if they misstate the law. Allen, 182 Wn.2d at 373.

Monroe challenges two of the prosecutor's statements in closing argument. During a discussion on the self-defense standard, the prosecutor argued that Monroe's decisions to arm himself and then take his gun into his backyard were not reasonable in light of the verbal altercation that had occurred earlier in the day:

> Would a reasonably prudent person that's already been in a fight that day, who has already been yelling, whether you believe the State or the defense at all, has already had Mr. Monroe and Skyler Marquis, they're already going at it, the cops have already been called, would a reasonably prudent person be going out that day? No, they wouldn't.

> Would a reasonably prudent person, knowing that he's just been threatened with a pickaxe, be going anywhere near the guy with the pickaxe again? No, he wouldn't. He'd be calling the cops. We know that they can, they already have. Why then? Anger. Don't mess with me.

And in rebuttal, the prosecutor argued Monroe's conduct was not reasonable because while he had the right to carry a gun, it was not a good idea to do so:

> Bobbi stated they decided to take the fence and to lower it, they wanted to finish the project, that after 20 minutes they thought it was best to arm himself. Counsel repeated you have a right to carry firearms. You have a right to carry them openly, on your hip. You can do it in supermarket, you can do it at your home, you can

do it while you're mowing the lawn. Absolutely right. Sure can. But that doesn't mean you have the right to point it at people. It doesn't mean you have the right to threaten people with them. And it doesn't mean, and it especially doesn't mean, that it's always a good idea. Just because something is a right doesn't mean it's a good idea.

For the better part of two hours, or however long it was they had been fighting over this, and the only person that brought this [gun] into the equation is Mr. Monroe. And the only one who pointed this [gun] was Mr. Monroe. This is assault. This is assault whether he aimed it perfectly or not. This is a bad idea. This always was a bad idea.

We agree with Monroe that these statements were a misstatement of the law and, thus, improper. First, the jurors were instructed that Monroe's decision to draw his pistol was lawful if he reasonably believed that he or Bobbi was about to be injured, taking into consideration all of the facts and circumstances that Monroe knew at the time of and prior to the incident. While the jury must take into account all the circumstances of the situation, "[t]he justification of self-defense must be evaluated from the defendant's point of view as conditions appeared to [him] at the time of the act." State v. Allery, 101 Wn.2d 591, 594, 682 P.2d 312 (1984). In this case, "the time of the act" was when Monroe pointed his gun at Skyler, not when he decided to arm himself. While it is appropriate to argue that Monroe armed himself to intimidate Skyler, it is an incorrect statement of the law to argue that the act of arming oneself is an unreasonable use of force.

Second, the prosecutor implied that if Monroe had been reasonably prudent, he would have retreated into his home, stayed there, and certainly not taken a gun into his backyard. But there is no duty to retreat when one is in a place where he as a right to be. Id. at 598. Instruction 12 made it clear that the law does not impose a duty to retreat and retreating should not be considered as a

reasonably effective alternative to a show of force. The prosecutor's statements were inconsistent with the law as set out in Instruction 12.

Additionally, it was also improper to argue that Monroe had a duty to retreat from his backyard when the trial court denied the State's requested first aggressor instruction. See State v. Riley, 137 Wn.2d 904, 909-10, 976 P.2d 624 (1999) (the right of self-defense cannot be invoked by an aggressor or one who provokes an altercation unless he in good faith first withdraws from the combat at a time and manner that lets the other person know he is withdrawing from further aggressive action).

Although we conclude that there were two misstatements of the law, we must still decide whether Monroe was prejudiced by the improper statements. Monroe admits that he did not object to these statements. Therefore, we must determine whether the "prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Id. at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Division Two of this court addressed a similar argument in State v. Asaeli, 150 Wn. App. 543, 208 P.3d 1136 (2009). In that case, the defendant, convicted of murder, argued that the prosecutor's slides, shown to the jury during closing argument, implied the first aggressor limitation that the trial court had rejected. Id.

at 594. The court agreed that the slides improperly suggested that self-defense was not available to the defendant if the defendant had acted first because the statements were not "confined to the law as set forth in the instructions given by the court." Id. at 595 (quoting State v. Davenport, 100 Wn.2d 757, 760, 675 P.2d 1213 (1984)).

But the Asaeli court also concluded that the error could have been easily alleviated with a curative instruction and that the defense attorney failed to request such an instruction. Id. at 595-96. For that reason, it held there was no prosecutorial misconduct. Id.

We conclude that had Monroe objected to the prosecutor's statements as improper statements of the law or statements of law not included in the court's instructions, the trial court could have reiterated to the jury that Monroe had no duty to retreat from his own backyard and that the mere possession of a firearm, without more, was not an unlawful use of force. Such instructions would have eliminated any possible confusion and cured any potential prejudice. As in Asaeli, we conclude Monroe has failed to show that he is entitled to appellate relief on this basis.

Additionally, Monroe has not established a substantial likelihood that the statements affected the jury's verdict. In analyzing prejudice, we do not look at comments in isolation but in the context of the total argument, the issues in the case, the evidence, and the instructions given to the jury. State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018).

First, although the prosecutor initially implied Monroe had a duty to retreat or should never have gone into his backyard wearing a holstered gun, the prosecutor subsequently made it clear that Monroe had the right to stand his ground, had the legal right to carry a firearm, and had the right to carry it openly.

Second, the State's theory of the case was that Monroe did not fear for his or Bobbi's safety and any argument to the contrary was not credible in light of both Bobbi's and Monroe's conduct that day. There was substantial evidence to support this theory. The State presented evidence that Monroe verbally abused Skyler repeatedly, challenging his manhood, and then decided to carry his gun, not because he feared for his or his wife's personal safety, but because he wanted to intimidate Jennifer and Skyler. Monroe denied drawing his pistol (contrary to his wife's testimony) and then admitted doing so only after Officer Smith confronted him about the photo of Monroe pointing the pistol at Skyler. And still Monroe insisted to the police that he never pointed the gun at Skyler, despite photographic evidence to the contrary. Bobbi admitted that she realized within seconds that Skyler held a cell phone, not a gun. And she never reported feeling threatened or harassed by Skyler despite two interactions with the police that day. This evidence supported the State's theory that Monroe sought to bully and intimidate his neighbors and had no fear of bodily harm.

Third, the jury was correctly instructed on the law of self-defense, the duty to retreat (or lack thereof), and the burden of proof. We presume the jury followed these instructions absent evidence to the contrary. State v. Swan, 114 Wn.2d 613, 661-62, 790 P.2d 610 (1990).

Taken in the context of all the testimony at trial, the prosecutor's complete closing argument, and the jury instructions, Monroe has not established a substantial likelihood that the prosecutor's isolated improper statements affected the jury's verdict. The prosecutor's misstatements did not deny Monroe a fair trial.

C. Cumulative Error

Lastly, Monroe argues that the instructional errors and prosecutorial misconduct, combined with a burden-shifting remark in closing—"[I]f it was in self-defense, why didn't he say so?"—denied him a fair trial. We disagree.

Under the doctrine of cumulative error, "a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." Emery, 174 Wn.2d at 766. But we have concluded that Monroe failed to demonstrate instructional error or the requisite prejudice from the prosecutor's improper remarks. Furthermore, the trial court sustained Monroe's objection to the prosecutor's burden-shifting remark and instructed the jury to disregard it. Therefore, Monroe has not shown a fundamentally unfair trial based on cumulative errors and is not entitled to a new trial.

Affirmed.

WE CONCUR:

_Andrus, J._

_Smith, J._

- 23 -