

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  37832-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| M.P.B., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — M.P.B. appeals his adjudication as guilty of the third degree theft of a set of elk antlers belonging to his grandfather.  He contends that (1) insufficient evidence supported the element of an intent to deprive, (2) the State committed prosecutorial misconduct by questioning and argument that shifted the burden of proof, and (3) a community supervision condition prohibiting contact with "any persons deemed to be harmful" is unconstitutionally vague.

The State responds that M.P.B. has completed his community supervision, and it asked that we dismiss the appeal based on a stipulation of the parties.  After repeated requests that the State provide us with M.P.B.'s stipulation, however, none was forthcoming.

Addressing the appeal on the merits, we find that the challenge to the condition of

community supervision is moot and no other error or abuse of discretion is identified.

We affirm.

FACTS AND PROCEDURAL BACKGROUND

The following facts are primarily drawn from the trial court's findings of fact. While M.P.B.'s opening brief assigns error to "the findings and conclusions following the bench trial," Appellant's Opening Br. at 1, he fails to separately identify challenged findings as required by RAP 10.3(g) and does not present argument why specific findings are unsupported or cite to the record in support of that argument.  The findings are therefore verities.  *Inland Foundry Co. v. Dep't of Labor & Indus.*, 106 Wn. App. 333, 340, 24 P.3d 424 (2001).

In April 2020, M.P.B., then 16 years old, was living with his grandparents, Micky Bernier and Debra Turner.  On April 13, Mr. Bernier was told by his granddaughter that a set of elk antlers was missing from his basement.  Mr. Bernier was upset, because the antlers were from the first elk he ever shot, when he was aged 16 and hunting with his father.  Mr. Bernier had mounted the antlers himself.

Mr. Bernier called the Asotin County Sheriff's Office that day to report the theft. Sergeant Cory Kingsbury took the report.  Mr. Bernier told the sergeant that he suspected the antlers had been taken by his grandson, M.P.B., and M.P.B.'s friend, Dylan Haworth. Mr. Bernier would later testify that about a month before the antlers went missing, M.P.B. asked if he could "take the[ ] antlers up to Moscow[, Idaho]," saying he could

2

"sell them and make some money, quick money." Report of Proceedings (RP) at 36. Mr. Bernier would testify that he told M.P.B. "absolutely not," and to "keep his hands off of them." *Id.*

A couple of days after reporting the theft, Mr. Bernier called the Asotin County Sheriff's Department again, this time to report having seen a red SUV parked on Highway 95 that he knew was a vehicle used by Mr. Haworth. Mr. Bernier suspected the SUV had been used in the theft of his antlers. At the behest of the Asotin County Sheriff's Department, Matthew Alldredge, a Latah County, Idaho, sheriff's deputy, traveled to the SUV's location. After seeing a set of antlers inside, he impounded the vehicle.

The red SUV turned out to be owned by Mr. Haworth's mother. Upon learning of the impoundment, she disavowed ownership of the antlers seen inside her car. She consented to her car being searched and to the antlers being seized. Mr. Bernier identified the antlers seized from the SUV as his. M.P.B. was charged with theft in the third degree.

*Adjudication and Disposition Hearing*

The matter proceeded to an adjudication and disposition hearing in juvenile court. The State called Mr. Bernier, Sergeant Kingsbury and Deputy Alldredge as witnesses. M.P.B. testified in his own defense.

Micky Bernier testified consistent with the facts set forth above. He also testified

that after the antlers were recovered, he listened to a recorded conversation between his wife and M.P.B. in which M.P.B. admitted to Ms. Turner that he had taken the antlers and was sorry. The recording itself was not offered as evidence; Mr. Bernier testified, "I can't find it. I'm sorry." RP at 37.

M.P.B. admitted at trial that he took the antlers, but testified that he received his grandmother's permission to borrow them. He testified he wanted to use them to decorate his and Mr. Haworth's newly-acquired, sparely furnished apartment for a gathering with some friends. M.P.B. testified that he and Mr. Haworth were returning the antlers to his grandparents' house when their car became disabled. He testified that while the SUV was found parked heading in the opposite direction, it was only because they turned around upon having car trouble. M.P.B. testified that the reason he did not ask Mr. Bernier's permission to take the antlers was because he did not have his telephone number, and it was his understanding that his grandmother, as Mr. Bernier's wife, could give him permission.

During M.P.B.'s direct examination, M.P.B. was asked about whether Ms. Turner typically recorded telephone conversations, and he answered, "Yes, her phone automatically does. It records every phone call that she gets." RP at 90. This led to the following cross-examination of M.P.B. that eventually drew objections and the claim of prosecutorial misconduct asserted on appeal:

4

[PROSECUTOR]: Let me ask you this. If you knew that your grandmother recorded all the calls and you testified you did, why didn't you ask your grandmother for a copy of the conversation where she told you—where you claim she said it was okay to take the antlers?

. . . .

A.      Because she—if I would have asked her she still would have said no because I would not help with getting my dad out of jail.

RP at 96. (M.P.B.'s answer about "not help[ing] with getting [his] dad out of jail" related to prior testimony. In cross-examination by the defense, Mr. Bernier admitted that M.P.B.'s father was in prison, having been convicted of raping M.P.B.'s sisters. Mr. Bernier testified that the conviction had been based on "a bunch of lies" by the children, including by M.P.B. RP at 43.)

The questioning continued:

Q.      But you knew there was a recording?

A.      Yes.

Q.      And you didn't make any effort to get that recording to prove that she'd given you permission?

A.      I did.

Q.      What did you do?

A.      I asked her.

Q.      And what did she tell you?

A.      She has no recording.

Q.      All right. You knew that—the whole heart and soul of your case is that your grandmother gave you permission. Is that correct?

A.      Yes, sir.

Q.      Why didn't you subpoena her?

A.      I—what does subpoena mean?

5

Q.      Why didn't you bring her to court to testify to that?

A.      She—I'm 17.  I don't think I can make her.  I'm not sure what that means.

Q.      Do you think that if the heart and soul of your case is that you had permission, don't you think that the person that gave you permission should tell the Judge that you had permission?

A.      Yes.

Q.      But you didn't bring her in?

A.      I didn't know I was able to.  I'm sorry.

Q.      You knew that your grandfather from day one said you took the antlers without permission.

A.      Yes.

. . . .

Q.      Why didn't you bring Mr. [Dillon] Hayworth to testify that you were just taking the antlers for a weekend for a party?

A.      Because he has warrants in Washington so he's not coming down.

Q.      You didn't make any effort to bring him in?

A.      I did.  I told him I really—

RP at 96-98.  At this point, defense counsel objected:

[DEFENSE COUNSEL]:  Objection, Your Honor.  It's not his responsibility, it's mine and I did contact the State and ask for help in getting him and getting information so he could be subpoenaed.

[PROSECUTOR]:  But this is a witness particularly available to [M.P.B.] and who—who under the missing witness doctrine he should have brought these witnesses in.

RP at 98.  The lawyers argued briefly about whether "grandmother's permission"

had been disclosed as a defense.  The court then ruled on the pending objection:

6

THE COURT: Hold on. Hold on. Hold on. First of all, a Defendant has no obligation to present any evidence. And secondly, this is more argument upon closing than it is questioning of the Defendant. So, I'm going to ask that you cease this line of questioning and proceed to another issue.

RP at 99.

A few moments later, the prosecutor asked M.P.B., "Do you have any evidence at all to support your claim that you had permission?" RP at 100. M.P.B. answered, "Yes," but defense counsel objected, "[T]he burden is not on us." *Id.* The trial court struck the question.

During its closing statement, the State argued:

Now, after all the evidence is laid out, he [M.P.B.] comes in and he says I did it because I had permission from my grandmother. Yet, he produces absolutely no evidence to support that. And it is true that it is not incumbent on a Defendant to present any evidence whatsoever. But once the Defendant asserts a claim, a defense, it is incumbent on him to support that. He can't simply come in and say yeah, I did it but I had permission. There is no evidence to support his version.

RP at 103-04. M.P.B. did not object to the State's argument.

The trial court found that M.P.B.'s claims were not credible. Its findings state specifically that it disbelieved M.P.B.'s testimony that he did not have Mr. Bernier's phone number. It found, based on Mr. Bernier's testimony, that M.P.B. phoned his grandfather to request an unrelated favor on the day after Mr. Bernier reported the antlers stolen.

The trial court also specifically found it was not credible that Ms. Turner would

7

have given M.P.B. permission to take an item that was so important to Mr. Bernier. It specifically found it was not credible that M.P.B. thought he had permission to take the antlers when Mr. Bernier had so emphatically rejected M.J.B.'s request that he be allowed to sell or pawn them.

The court found M.P.B. guilty of third degree theft and imposed six months of community supervision. One condition of M.P.B.'s community supervision was that he "not have any contact, except through counsel or a probation officer, with any persons deemed to be harmful to the successful completion of probation and the following individual[ ]: Dylan Haworth (Krieger)." Clerk's Papers (CP) at 21. M.P.B. appeals.

## ANALYSIS

I. THE STATE PRESENTED SUFFICIENT EVIDENCE OF M.P.B.'S INTENT TO DEPRIVE HIS GRANDFATHER OF THE ANTLERS

RCW 9A.56.050(a) provides that a person is guilty of theft in the third degree if he or she commits theft of property or services that does not exceed $750 in value. RCW 9A.56.020(1)(a) defines "theft" to mean "[t]o wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services." M.P.B. contends there is insufficient evidence that he acted "with intent to deprive" Mr. Bernier of the elk antlers.

"[F]ollowing a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support

the conclusions of law." *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). This court views "the evidence in the light most favorable to the prosecution and determine[s] whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." *Id.* at 105. Substantial evidence is evidence "sufficient to persuade a fair-minded person of the truth of the asserted premise." *Id.* at 106. "Deference must be given to the trier of fact who resolves conflicting testimony and evaluates the credibility of witnesses and persuasiveness of material evidence." *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989). The challenging party bears the burden of demonstrating that a finding is unsupported by substantial evidence. *State v. Vickers*, 148 Wn.2d 91, 116, 59 P.3d 58 (2002).

M.P.B. contends that no direct evidence supports that he took the elk antlers with the intent to deprive. He argues that his own testimony was that he took the antlers with Ms. Turner's permission and there was no evidence to refute that—Mr. Bernier testified only that *he* did not give permission.

M.P.B.'s argument assumes his testimony about receiving permission from his grandmother is entitled to some weight. But the trial court gave it no weight. It made a general finding that M.P.B. was not credible, and a specific finding that he was not credible when it came to his claim that his grandmother gave him permission to take the antlers. We do not reweigh credibility determinations made by the trier of fact. *Morse v. Antonellis*, 149 Wn.2d 572, 574, 70 P.3d 125 (2003).

In addition, Mr. Bernier testified to hearing the recording of M.P.B. apologizing to his grandmother for taking the antlers. Mr. Bernier also testified about M.P.B.'s stated interest a month earlier in pawning or selling the antlers in Moscow and to his own emphatic response, including that M.P.B "keep his hands off" the antlers. RP at 36. Deputy Alldredge testified to locating the antlers not in M.P.B.'s and Mr. Haworth's apartment, but in a disabled SUV located on Highway 95 headed away from the Bernier home and toward Moscow.

Viewed in the light most favorable to the State, the trial court could reasonably find an intent on M.P.B.'s part to deprive his grandfather of possession of the antlers.

## II.     PROSECUTORIAL MISCONDUCT IS NOT SHOWN

M.P.B. next contends the State committed prosecutorial misconduct when it engaged in "burden-shifting" cross-examination and closing argument about why M.P.B. did not call his grandmother or Mr. Haworth as witnesses at trial. He argues that "[b]ecause [he] objected to the alleged misconduct at trial," he is merely required to show that the prosecutor's conduct was improper and prejudicial in the context of the entire trial. Br. of Appellant at 11; *State v. Walker*, 182 Wn.2d 463, 477, 341 P.3d 976 (2015). But M.P.B. made only two objections, late in the complained-of questioning, and both were sustained. His complaint on appeal is about unobjected-to questioning and argument. His burden is to demonstrate misconduct so flagrant and ill intentioned that an instruction would not have cured the prejudice. *Id.* at 477-78.

It is improper for the prosecution to comment on a defendant's lack of evidence. *State v. Sundberg*, 185 Wn.2d 147, 153, 370 P.3d 1 (2016). "One exception to this rule is that if the defendant testifies about an exculpatory theory or defense that could have been corroborated by an available witness, then, in limited circumstances, the State may call attention to the defendant's failure to offer corroborating evidence." *Id.* (citing *State v. Blair*, 117 Wn.2d 479, 481, 816 P.2d 718 (1991)). "[I]n limited situations where a defendant actually testifies[,] prosecutors are permitted to comment on a defendant's failure to produce corroborative evidence to support their testimony and . . . such comments do not improperly shift the burden of proof." *Id.* at 155-56. This is because "'[w]hen a defendant advances a theory exculpating [her], the theory is not immunized from attack. On the contrary, the evidence supporting a defendant's theory of the case is subject to the same searching examination as the State's evidence.'" *State v. Vassar*, 188 Wn. App. 251, 260, 352 P.3d 856 (2015) (quoting *State v. Contreras*, 57 Wn. App. 471, 476, 788 P.2d 1114 (1990)). In *Vassar*, in which the defendant testified that a piece of inculpatory evidence was forged, it was not improper for the State to comment that no evidence showed the evidence was forged. *Id.* at 256.

When a person who could have been a witness at the trial is not called to testify, the trier of fact may reasonably infer that the "missing witness's" testimony would be unfavorable to the party failing to call the witness. In a jury trial, the inference can only be instructed on and argued if the evidence meets all of the following requirements:

(1) the witness must be peculiarly available to the party, (2) the testimony must relate to an issue of fundamental importance as contrasted to a trivial or unimportant issue, and (3) the circumstances must establish, as a matter of reasonable probability, that the party would not knowingly fail to call the witness in question unless the witness's testimony would be damaging. *State v. Montgomery*, 163 Wn.2d 577, 183 P.3d 267 (2008).

Had M.P.B.'s been a jury trial, the State would have been required to persuade the trial court outside the presence of the jury that it was entitled to a missing witness instruction and to argue the inference—and courts are cautioned to use such an instruction sparingly. *See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL § 5.20, cmt. at 194-95 (5th ed. 2021). In a bench trial, argument that a party is entitled to urge this "missing witness" inference must be presented to the judge—the trier of fact—because there is no other gatekeeper.

M.P.B. acknowledges that because of the "unique demands" bench trials place on judges, "requiring them to sit as both arbiters of law and as finders of fact," Washington case law presumes that the judge in a bench trial does not consider inadmissible evidence in rendering a verdict. *State v. Read*, 147 Wn.2d 238, 245-46, 53 P.2d 26 (2002). The presumption that the trial court in a bench trial has considered only admissible evidence does not apply when the judge actually considers matters that are inadmissible, however. *State v. Gower*, 179 Wn.2d 851, 856, 321 P.2d 1178 (2014).

M.P.B.'s claim of prosecutorial misconduct fails. He does not demonstrate that the prosecutor's unobjected-to questions and argument were so flagrant and ill intentioned that no instruction would have cured the prejudice. He does not demonstrate that the trial court actually considered any inadmissible evidence. The prosecutor might have believed his questions fell within the legitimate bounds of pointing out a lack of corroboration for the defense's exculpatory theory and advancing a missing witness inference. The prosecutor's closing argument that "it is *incumbent on* [M.P.B.] to support [his claim]," falls outside the exception that permits the State to "call attention to" or "comment on" a defendant's failure to offer evidence corroborating an exculpatory theory, but the argument was made in a bench trial. And the judge had already commented that "a Defendant has no obligation to present any evidence." RP at 104, 99 (emphasis added).

M.P.B. segues at page 14 of his opening brief into a charge that the trial court *itself* misapplied the burden of proof. He relies on *State v. Roberts*, 88 Wn.2d 337, 562 P.2d 1259 (1977), and the trial court's finding 27. In finding 27, the trial court found that M.P.B.'s claim about having his grandmother's permission was not credible, and stated, in language to which M.P.B. attaches significance, "nor is it supported by the evidence produced at trial." CP at 25; *see* Br. of Appellant at 14.

*Roberts* held that in a second degree murder prosecution, because a defendant's claim of self-defense negates the essential element of lack of justification, the defendant

13

is not required to prove self-defense. The burden remains on the State to prove lack of justification. M.P.B. treats the trial court's statement "nor is it supported by the evidence produced at trial" in finding 27 as equivalent to requiring a murder defendant to prove self-defense.

If M.P.B. proved that his grandmother gave him permission to take the antlers, it would not negate any element of third degree theft. His grandmother may have lacked authority to give permission. M.P.B. might have secured her permission so as not to encounter resistance when he took the antlers, at the same time fully intending to pawn or sell them. The claimed permission was merely one piece of evidence in support of his defense theory of an innocent borrowing.

That the State bears the burden of proving every essential element of a crime does not mean it bears the burden of disproving each and every piece of evidence relied on by the defense for an exculpatory theory of the case. The trial court's finding that M.P.B. failed to prove a nonelemental piece of its defense theory did not shift the burden of proof.

III.   THE CHALLENGE TO M.P.B.'S COMMUNITY SUPERVISION CONDITION IS MOOT

Finally, M.P.B. argues that the condition of his community supervision prohibiting him from contact "except through counsel or a probation officer, *with any persons deemed to be harmful to the successful completion of probation*" is unconstitutionally vague. CP at 21 (emphasis added). The State's report that M.P.B. has completed his

term of supervision without incident has significance in connection with this assignment of error. A case is moot if a court can no longer provide effective relief. *State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995).

We may consider a moot issue that involves matters of continuing and substantial public interest. *State v. Cruz*, 189 Wn.2d 588, 597-98, 404 P.3d 70 (2017). But this challenge to the community supervision condition had become moot even before the filing of M.P.B.'s opening brief.[1] If there were reasons we should consider this moot issue, M.P.B. should have identified and argued them. We decline to consider it.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____          _____
Pennell, C.J.                                                    Fearing, J.

---

[1] The community supervision commenced with entry of the trial court's order on adjudication and disposition entered on October 21, 2020. CP at 20-21.